Craig WHITE and Karmen White

v.

Kevin EARLY; V.H. ("Herb") Pickle; Steve C. Pickle; Lakewood Marina, A General Partnership; Lakefront Properties, Inc.; and Lakewood Marina, A Limited Partnership.

Court of Appeals of Tennessee, Western Section, at Nashville.

July 13, 2005 Session.

May 24, 2006.

Permission to Appeal Denied by Supreme Court Oct. 16, 2006.

Kenneth R. Jones, Jr., and William B. Hawkins, III, Nashville, Tennessee, for the appellants, V.H. "Herb" Pickle, Steve C. Pickle, and Lakefront Properties, Inc.

Shawn McBrien, Lebanon, Tennessee, for the appellant, Kevin Early.

Anne C. Martin, Nashville, Tennessee, for the appellees, Craig and Karmen White.

## OPINION

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

This is a fraudulent misrepresentation/breach of contract claim involving the sale of a boat slip. The defendant owned a marina on a lake, which was subject to a twenty-year lease from the U.S. Army Corps of Engineers. The defendant marina owners sold boat "slips" at the marina, that is, space at a dock at which the owner could dock his boat. In May 2000, the plaintiffs purchased the defendant slip owner's boat slip at the marina. The defendant marina owners acted as brokers for the defendant owner of the slip and

received a commission on the sale. Prior to the sale, the defendant marina owners represented to the plaintiffs that (1) the defendant slip owner had clear title to the boat slip, and (2) the Corps of Engineers lease, which allowed the marina to operate on the lake, would be in effect for another twenty years, when actually the lease was scheduled to expire in 2005. In August 2000, it was discovered that the breakwater barges surrounding the perimeter of the marina were in a dangerous condition, and the Corps ordered the defendants to remove the barges. A dispute arose about who was responsible for removing the barges, the defendant marina owners or the association of boat slip owners. The deteriorated barges were not removed. Consequently, the Corps revoked its lease, the marina closed, and the plaintiffs were no longer able to use their newly purchased boat slip. The plaintiffs filed this action against the defendant marina owners and the previous owner of the slip, alleging fraudulent misrepresentation, breach of contract, and violation of the Tennessee Consumer Protection Act. After a bench trial, the trial court held in favor of the plaintiffs, finding that the defendant marina owners made fraudulent misrepresentations and that the defendant slip owner transferred rights that were illusory. All of the defendants appeal. We reverse, finding, *inter alia*, that valuable rights were transferred and that the damages to the plaintiffs were not caused by the allegedly fraudulent misrepresentations.

1. At all pertinent times, Herb Pickle was the sole active stockholder.

2. The lease was originally owned by Marina Associates, Inc., in 1986, but was later assigned to the Pickles. The Corps approved the assignment to the Pickles in January 1995. Later, Steve Pickle assigned his lease interests to Herb Pickle, who remained the lessee until it was revoked in September 2001.

This case involves a somewhat convoluted series of transactions surrounding the sale of a boat slip in a marina. A review of the facts leading up to the sale is necessary to an understanding of the issues on appeal.

## BACKGROUND

Defendant/Appellant V.H. "Herb" Pickle ("Herb") owned stock in a corporation called Lakefront Properties, Inc. ("LPI"), along with two other individuals not involved in this lawsuit.[1] LPI owned real property on Old Hickory Lake. The easement which permits access to Old Hickory Lake belongs to the Army Corps of Engineers ("Corps of Engineers"). Herb Pickle and his son, Steve Pickle ("Steve") (collectively, "the Pickles"), obtained a twenty-year lease from the Corps of Engineers, which began in 1986 and was scheduled to expire in 2005.[2] This afforded the Pickles, as the lessees, access to Old Hickory Lake.

In 1988, Herb Pickle and his associates at LPI formed Lakewood Marina Limited Partnership ("the Limited Partnership") to refurbish the existing marina into what would be called Lakewood Marina ("the Marina") on the Old Hickory Lake property. In order to finance the development, the Limited Partnership promoted the sale of boat slips and/or boat slip rights. The Limited Partnership's general partner was LPI, and the limited partners were fifteen other individuals who bought boat slips.[3] The document creating the Limited Part-

3. LPI, which owned 86.3% of the Limited Partnership, made a capital contribution of $3,000,000. LPI obtained a bank loan for this contribution, which was paid off through initial boat slip sales. Each of the original limited partners made a capital contribution of between $10,000 and $45,000.

nership, signed by each of the fifteen limited partners and LPI, was filed with the Register of Deeds. LPI was the managing partner of the Limited Partnership business. According to the document creating the Limited Partnership, the stated nature of its business was "developing and leasing dock slips."

By the time the development was completed in 1988, the Marina consisted of about sixty boat slips, each about fifty to seventy feet in length. The slips could house large recreational vessels such as motor yachts. Six 200–foot barges were placed around the perimeter of the Marina. Most of the barges acted as a breakwater that shielded the docks and boats from waves and lake traffic. At least one of the barges was used as a walkway to access the boat slips. Concrete decks were placed on the breakwater barges for use as large patios on which some slip owners maintained lawn furniture and entertained guests. LPI owned about three acres of land adjacent to the marina that was used for parking, ingress, and egress.

When the Limited Partnership was created, each limited partner received a boat slip or slips in return for his investment. Apparently, there are no records indicating which boat slip belonged to whom at that time. After execution of the Limited Partnership agreement, more boat slips were sold by the Limited Partnership, and the purchasers were considered by the Pickles and the Corps to be additional limited partners. The capital contributions from these initial investors were used by the Limited Partnership to pay the off the loan from the bank. By 1992, the Limited Partnership had forty-four limited partners/boat slip owners, the maximum approved by the Corps. However, the Limited Partnership agreement was ap-

parently never amended to include more than the original fifteen limited partners.

A secondary market developed in which the original owners (also called limited partners) sold their boat slips to third parties. The proceeds of such sales went to the individual slip owners. Herb and Steve Pickle assisted in the sale of some of the boat slips, acting in effect as brokers, and collected commissions under the name of Lakewood Marina, a partnership. These transactions ordinarily were not reduced to writing. The Pickles believed that these subsequent purchasers automatically became limited partners upon purchase of a slip, even though the subsequent purchaser's interest was not reduced to writing.

Thus, unlike a marina that rented its boat slips to individuals under short-term leases, Lakewood Marina allowed its boat slip owners to have a bundle of rights along with their ownership. Lakewood Marina boat slip owners had exclusive rights to their boat slip to use, rent, or sell for as long as the Corps of Engineers lease allowed the Marina to exist. In addition, the boat slip owners were given exclusive use of the patio area on the barge across from the slip, as well as use of the common areas and the surrounding area for parking, ingress, and egress.

In 1991, an association of boat slip owners was formed; it was an unincorporated association called the Lakewood Yacht Club ("Yacht Club" or "the association").[4] Gradually, the Yacht Club took over regular maintenance of the Marina. For this service, it collected a monthly fee from its members. The funds were used to repair barges, mow grass, and remove trash. Every slip owner was expected to join the Yacht Club and pay the monthly fee.

---

4. The Yacht Club was converted to a not-for-profit corporation on November 13, 2000.

In August 1991, at the request of the Yacht Club, Herb Pickle, as representative of LPI, signed and filed a document entitled "Declaration of Covenants" ("the Declaration"), which was designed to clarify the rights and obligations of the Yacht Club and its members. Under the Declaration, LPI granted Yacht Club members the right to use the real property adjacent to the Marina for ingress, egress, parking, and other marina purposes. LPI also agreed to provide a specified number of paved parking spaces. In return, the Yacht Club accepted control of all Marina operations, administration, and management. The Yacht Club undertook the responsibility to maintain, repair, and replace all improvements, including piers, docks, boat slips, fences, parking areas, and breakwater barges. The Declaration of Covenants was recorded with the Davidson County Register's office. Despite execution of the Declaration by LPI and the Yacht Club, the Corps of Engineers' lease was not amended to reflect any change in the allocation of responsibilities. Therefore, as between the Corps of Engineers and the Pickles, the Pickles, as the lessees, remained responsible for maintenance at the Marina.

Under the lease with the Corps of Engineers, the Corps had the power to revoke its lease if the Pickles, as the lessees, violated the terms and conditions of the lease. One term of the lease provided that the lessees could not transfer the lease or sublet without permission in writing from the District Commander of the Corps of Engineers. The lease also provided that the lake access premises would be accessible to and available for use by the general public.

In 1992, the Pickles asked the Corps about the status of limited partners who sold their boat slips. In response, the Corps sent a letter to Herb Pickle dated September 10, 1992, informing him that, in light of the forty-four limited partners already involved, "you will not be permitted to add additional limited partners," and that "the use of limited partnerships as a method of concession of ownership was approved under the conditions that the marina be maintained as a public facility." In a letter dated May 20, 1993, the Corps reiterated this position and explained that no more limited partners would be approved unless the Marina expanded its facilities. In another letter to Herb Pickle, dated December 12, 1994, the Corps told Pickle that no additional limited partners could be added. The letter stated that "should any partner wish to end their relationship with Lakewood, the vacated slip should be made available for public rental. Keep in mind that we approved the taking in of limited partners, not the sale of individual slips to private owners.... [T]his situation, if not remedied, will be considered when the lease expires in 2005." Despite the statement in this letter, the Corps acquiesced in the transfer of boat slips or boat slip rights to other individuals, so long as the number of slip owners did not exceed forty-four.

## THE WHITE'S PURCHASE OF BOAT SLIP # 13

In May 2000, on Memorial Day weekend, Plaintiff/Appellees Craig and Karmen White (collectively, "the Whites") became interested in purchasing boat slip # 13 from the owner, Defendant/Appellant Kevin Early ("Early"). That weekend, Craig White visited the Lakewood Marina property four times, twice meeting with Herb Pickle and twice meeting with Steve Pickle.

In the course of these meetings, Steve Pickle told the Whites that he and Herb Pickle were the slip brokers at the Marina and the owners of the marina lease with the Corps of Engineers. Steve Pickle told

the Whites that, if they bought the slip, they would be expected to pay $100 per month to an association for trash pick-up and grass mowing. The Whites were also told that they could buy into a limited partnership which the Pickles owned. Herb Pickle told the Whites that the Corps lease and/or the breakwater barges around the perimeter of the Marina had been in existence for twenty years and would be there another twenty years. Although Craig White asked to see the lease, the inspection reports, the association meeting minutes, and the association rules, those documents were not provided to him at that time.

The Whites' fourth visit to the marina took place on Memorial day. Steve Pickle and Early met with the Whites on Early's boat in slip # 13 to discuss the sale of the slip. Craig White remarked that he wanted a document showing what he would be purchasing if he were to buy the slip. In response, Steve Pickle went to his office and returned with a document entitled "Bill of Sale" for Early and the Whites to sign. The pre-printed form was actually intended for use in the sale of a boat, but Steve Pickle adapted it to apply to the sale of the boat slip. The Bill of Sale stated that Early "is (are) the lawful ownwe(s) [sic] of [slip # 13], with a good right to sell and transfer title and that there is no lien or encumbrance thereon...." The Bill of Sale included no language regarding the other rights that went along with ownership of a slip, such as use of the patio, the common areas, parking, etc. The Whites and Early executed the Bill of Sale, and the Whites paid Early $62,500 for the slip. Thereafter, the Whites began making monthly payments to the Yacht Club for maintenance fees.

## THE CLOSING OF THE MARINA

In the meantime, the condition of the breakwater barges surrounding Lakewood Marina had deteriorated significantly. The need to repair leaks and cracks in the barges arose more frequently, and the water in the barges periodically had to be pumped out. By late summer of 2000, the barge conditions had substantially worsened. In August 2000, just a few months after the Whites had purchased boat slip # 13, the Corps of Engineers concluded that, if the barges continued to take in water, they would sink and take all the boats and structures with them. Consequently, the Corps deemed the barges to be unsafe.

On September 12, 2000, the Corps of Engineers wrote the Pickles a letter declaring the barges to be unsafe and ordering the Pickles to remove the barges. At approximately the same time, the Corps roped off the barges, preventing access to the patios on the barges. Later, the bridge on the barge used to access the slips was removed. At that point, there was no way to access the boat slips, including the slip the Whites had recently purchased, slip # 13. The cost of removing the barges was $300,000, which came to about $5,000–$7,000 per slip owner. The Pickles told the Yacht Club to remove the barges, claiming that, under the Declaration executed by LPI and the Yacht Club, the Yacht Club bore the responsibility to pay for the removal of the barges. The Yacht Club denied having such responsibility and refused to pay for removal of the barges. This dispute resulted in a deadlock between the Pickles and the Yacht Club, with each asserting that the other was responsible for paying for removal of the unsafe barges. Consequently, a lawsuit was filed by the Yacht Club against the Pickles in chancery court styled *Charlie King, et al. v. V.H. "Herb" Pickle, et al.*, No. 01–827–I. The dispute was not resolved in time to save the marina. The barges were not removed by the Septem-

ber 10, 2001 deadline set by the Corps of Engineers. As a result, the Corps revoked the Pickles' lease and shut down the Marina.

Later, LPI sold the marina dock structures, the barges, and the adjoining land to Old Hickory Yacht Club ("Old Hickory"), the owner of the adjacent Old Hickory Boat Dock. After the sale, Old Hickory paid for the removal of the barges, and the Corps expanded the Old Hickory Boat Dock lease area to include the former Lakewood Marina lease area. None of the existing boat slip owners received any proceeds from the sale to Old Hickory.

## THE WHITES' LAWSUIT

On May 31, 2001, the Whites filed this lawsuit against Early, the Pickles, the Lakewood Marina general partnership, the Limited Partnership, and LPI, asserting misrepresentation, fraud, breach of contract, and violations of the Tennessee Consumer Protection Act, Tennessee Code Annotated § 47–18–101, et seq. ("the Consumer Protection Act").[5] The Whites alleged that Early and the Pickles misrepresented facts or failed to disclose facts relating to (a) the fact that ownership in the boat slip could not be sold according to the Corps of Engineers limitations; (b) the existence of the Limited Partnership and the fact that the Corps of Engineers considered ownership of the Marina to be a limited partnership interest only, rather than actual ownership of the slip; (c) the condition of the barges; and (d) issues with the Corps of Engineers relating to the lease and the duration thereof. Misrepresentations or failure to disclose matters relating to these issues, the Whites claimed, constituted material misrepresentations that induced the Whites to enter

into the transaction with Early to their detriment. The Whites asserted that the defendants' actions were willful and knowing or recklessly negligent, warranting punitive damages as well as compensatory damages. The Whites asserted as well that Early breached the contract to sell them boat slip # 13, because the slip did not have the properties it was claimed to have, and therefore Early did not have, and was therefore unable to convey, clear title to the slip. The Whites maintained that the actions and misrepresentations of the Pickles constituted unfair and deceptive acts in violation of the Consumer Protection Act and that, therefore, they were entitled to attorney's fees and treble damages. In addition, the Whites asserted claims based on trover and conversion and breach of the Limited Partnership agreement. They sought a declaration as to their rights to an interest in the Lakewood Marina general partnership and the Limited Partnership.

In response, in addition to an answer denying liability, Early filed a cross-claim against the Pickles, seeking damages for negligence in the event that he was found liable to the Whites. The Pickles also denied liability to the Whites and filed a third-party complaint against the Yacht Club and some of its members. This case was consolidated with the related case filed in chancery court by the Yacht Club against the Pickles. Later, however, the parties agreed, and the trial court ordered, that the consolidation be set aside. It was determined that this case would be tried first.

## THE TRIAL

A bench trial took place on November 3, 4, 5, 12, and 14, 2003. Several witnesses,

---

**5.** Although the original complaint named only Early, the Pickles, and the Lakewood Marina general partnership as defendants, the complaint was later amended to include as defen-

dants the Limited Partnership and LPI. The Pickles and the defendant entities in which they held an interest are referred to collectively as "the Pickle defendants."

including all of the individual parties, testified at trial.

Craig White ("Craig") testified first. As background, Craig said that, prior to the purchase of slip # 13, he had owned boats for twenty years and had rented a slip on Percy Priest Lake. Craig was friends with Mike Thilmony, who owned a boat slip at the Lakewood Marina. Thilmony had been happy with his ownership at the Marina. On Memorial Day weekend 2000, Craig was at Lakewood Marina and saw a sign on Early's boat in slip # 13 saying that a "dockominium" was for sale. On Friday, May 26, 2000, he met with Steve Pickle in his office on the property and talked to him about purchasing a slip. Steve showed Craig the common patio, generally used for parties and functions, as well as the private patios that were available with slip ownership. Craig testified that having the exclusive use of a private patio along with the slip was a "big part" of the benefit of owning the slip at Lakewood Marina.

Steve informed Craig that he and his father, Herb Pickle, owned the Corps lease to the Marina. He also told Craig that, for a fee of $100 per month, an association would take care of general maintenance such as trash pickup and grass mowing. Steve told Craig that he and his father owned a limited partnership, and that anyone who purchased a boat slip could buy into the limited partnership. Craig testified, "[i]t wasn't part of buying the slip, it was a separate deal completely.... [W]hat he told me is that him and his father owned the general partnership that sold limited partners[hips] to slip owners. That was it." Craig asked Steve for meeting minutes of the association and a copy of the Corps lease, which Steve agreed to provide.

The next day, Craig again visited Lakewood Marina with his friend, Rob Miller, who docked beside him at the Percy Priest Lake. On that day, Herb Pickle, rather than Steve, was available to discuss the matter with Craig White. Craig and Rob Miller were impressed with the boat slip and the Marina. Craig asked Herb Pickle for the documents he had requested from Steve the day before, but Herb demurred and said that Steve would provide them later. Craig asked Herb Pickle whether there were any problems at Lakewood Marina that he needed to know about. Herb responded that there were no problems, except that occasionally kids stole things.

Craig testified that he and Herb discussed the Corps of Engineers lease. In his testimony, Craig acknowledged that "it's common knowledge on the water that the Corps of Engineers controls everything that happens on the water." He admitted knowing that "nothing happens on that water without the Corps being involved in, no structures can be built or whatever, . . . and I knew that they did audits of the marina." He said that he knew that the existence of Lakewood Marina and his use of slip # 13 were subject to the Corps lease. Though he had asked for a copy of the lease, he said that the lease was never provided to him. Craig testified that when he asked Herb Pickle about his lease with the Corps, Herb said, "[I]ts been here for 20 years, it will be here for another 20." Craig took that to mean that he would have twenty more years to enjoy Lakewood Marina.

Craig said that, the next day, both he and his wife, Karmen, went to Lakewood Marina and met with Herb Pickle. The Whites again asked Herb about the Corps lease. Craig testified that Herb reiterated that "it's been here 20 years and it will be here another 20 years." Craig believed the comment to be a misrepresentation of fact, not puffing or an exaggerated sales pitch.

The next day, Memorial Day, the Whites went to the Marina to purchase boat slip # 13. Early was at the Marina on his large houseboat in slip # 13, preparing for a social function, and he invited the Whites onto his boat. The Whites had never met Early before that day. They asked Early if there were any problems at the Marina. Early said no, except that the association was in a tiff with the Pickles about parking arrangements.

When Steve Pickle arrived on Early's boat, Craig requested from him "paperwork" or a "bill of sale or contract that shows what I'm about to buy." In response to this request, Steve went to his office and retrieved the document entitled "Bill of Sale" that was ultimately executed by Early and the Whites. As noted above, the "Bill of Sale" was a pre-printed form intended to facilitate the sale of a boat, but was adapted for the sale of the boat slip. Craig was satisfied with the document. He said he relied on the warranty language in the Bill of Sale which said that Early had "title" to slip # 13. At that time, Craig saw no problem with the fact that the Bill of Sale contained no language about the use of the patios or about the existence of Lakewood Marina being subject to the Corps lease, because the Pickles had assured him that he had the exclusive right to the patio along with ownership in the slip, and that the lease would be in effect for twenty more years. Despite having not received any of the other documents they had previously requested, the Whites went ahead with the closing on boat slip # 13. Craig testified he was not concerned at the time, and that the paperwork was "irrelevant to me purchasing the slip at that point."

After they purchased the slip, the Whites allowed Early to keep his boat there for thirty days rent free. After that, they rented the boat slip to a third party

through November 2000 for $350 per month. Although the Whites were able to use the patio until Lakewood Marina closed, they never kept a boat in slip # 13.

After the Corps closed access to Lakewood Marina, Craig White became active in the Yacht Club. He hoped to help resolve the dispute over who was responsible for removing the barges in order to keep the Marina open. In October 2000, Craig wrote to Charlie King, the president of the Yacht Club, and requested all documentation that he had concerning the Marina. When Craig received the Declaration and the Limited Partnership agreement, he did not think they pertained to him, because he was not a limited partner. In the course of the negotiations, Craig became aware that if the unsafe barges were removed, the Corps would be willing to extend the Marina lease for another twenty years and recognize the boat slip owners' right to transfer the rights to their slips.

With respect to his ownership of boat slip # 13, Craig testified that he believed that he was purchasing something akin to a condominium, whereby he had ownership in the structure, but could not cut it out and take it away. Craig conceded that he knew he did not own an interest in real estate. He stated, "Its not a piece of real estate, it's a dock." He testified that he bought the right to use the dock, and knew that this ownership included the right to use the patio and two parking spaces. He admitted that these rights had value.

Karmen White's testimony largely corroborated the testimony of her husband. She recalled that Herb Pickle told her and her husband that both the barges and the Corps lease "have been here for 20 years, and they'll be here for another 20 years," and "we've got a 20–year lease and we'll have another 20–year lease." Karmen also believed that she and Craig were buying something akin to a condominium, where

they "could do anything [they] want with it; we could sell it." She said that no one used the term "right to use," but instead everyone used the terms "buying" and "purchasing" with respect to the slip. When she read the "Bill of Sale," she was comfortable with what she was signing because it included "everything we thought we were purchasing.... They told me I purchased a boat slip." Karmen agreed that, before the closing of the marina, she had the exclusive right to use the slip in any manner, to use the common entertainment area, and to use the private patio across from the slip. "[W]hen we purchased it, that came with the slip."

Karmen White acknowledged that she knew that the Corps of Engineers lease existed when they purchased the boat slip, and that the Corps has some control over the water. Karmen was under the impression that they had purchased the actual boat slip structure. In contrast to her husband's belief, she testified that she believed at the time that if the Corps ended its lease, they would be able to take the boat slip structure to another part of the lake and sell it or recoup some of their money.

Along with her husband, Karmen was involved in trying to negotiate a solution to the barge controversy. Although she was willing to pay for a portion of the cost of the barge removal to save the Marina, the Yacht Club and the Pickles could not come to an agreement. Karmen noted that the Pickles received a favorable ruling in the parallel chancery court suit filed by the Yacht Club against the Pickles. The Yacht Club had previously made the decision not to replace the barges if that court ruled against it. As a result, after the adverse court ruling, the Yacht Club refused to remove the barges, the lease was revoked, and the Marina was forced to close. Karmen was aware that the Corps had offered to approve a twenty-year extension on the lease if the barges were removed. She conceded that the Marina would still exist if the barges had been removed.

Herb Pickle testified on his own behalf. As background, he said that he, along with Charlie Turner and Linus Lippick, bought and renovated the Marina. The finances were handled by Charlie Turner, who was deceased at the time of trial. Herb Pickle's job was to manage the Marina. Because renting the boat slips was not generating enough income, he and his associates decided to "sell the use of the slips to pay off the bank." To this end, Herb obtained approval from the Corps to take in limited partners. Around 1991, the president of the Yacht Club approached him and asked him to agree to the Declaration, and he signed it without objection.

When asked about the Whites' purchase of boat slip # 13, Herb Pickle did not remember meeting with the Whites regarding their purchase. When slips were sold at the Marina, Herb kept no records of the sales, but instead gave the name of the purchaser to the Yacht Club for its records. Herb viewed the exclusive right to use a slip as essentially a limited partnership interest. When asked whether the Whites owned a boat slip or a limited partnership interest, Herb said, "[T]hey had the right to use their slip for the remainder of the Corps lease." He explained, "That's the way it's always been up there. That's the way the association ran it. If you had a slip, you became a limited partner, and we would give the names and address, and [the Yacht Club association] would bill accordingly." He said that the "Bill of Sale" was "more or less like a receipt," and through it the Whites purchased the exclusive right to use the boat slip during the Corps lease and all renewals.

Herb testified that he thought that the barges were fine in May 2000, and at that time had no reason to believe that there were any serious problems with the barges. Herb said that, if he made the statement to the Whites that the Marina had been there twenty years and would be for another twenty, he must have meant that the Marina had been there for many years, long before he became involved, and that it would continue to exist if it were properly maintained.

In August 2000, a maintenance worker told Herb that the barges were in danger of sinking. Herb then called the Corps to alert it to the problem. After the Corps inspected the barges, it determined that they were dangerous and needed to be removed. Herb said that, when he learned the Corps conclusion about the barges, he looked to the Yacht Club to remove them.

Herb acknowledged the correspondence from the Corps expressing the Corps position on the expansion of the limited partners. He said that the prohibition on the transfer of boat slips was never enforced, so long as the total number of slip owners remained fewer than forty-four. Herb said that the total number of limited partners, i.e. slip owners, never exceeded the limit set by the Corps. Under those circumstances, he said, the Corps did not object to the transfers of slips to others, as was done in this case.

Steve Pickle testified as well. He explained that the Marina was refurbished between 1986 and 1988. After it was initially renovated, he said, the Marina continued for some time to be a rental facility. Because the rentals were not going well and the bank loans needed to be paid, Herb allowed others to invest in the Marina as limited partners. Steve testified in general terms that limited partners bought slips for a lump-sum investment, and

thereby became slip owners and limited partners. When the initial boat slips were sold to the limited partners, the money was used by the Limited Partnership to pay off the bank loan. Steve Pickle was neither a limited partner nor a member of the Yacht Club, nor did he ever have any relationship with LPI as an employee or owner. He and his father owned Quick Boat Sales, through which he earned commissions by brokering the sale of boats. He also earned commissions brokering the sale of boat slips at the Marina. He explained that, when boat slips were transferred in the secondary market, the money went to the owner of the slip and he and his father Herb shared the commissions as partners.

Throughout his testimony, Steve Pickle referred to the boat slip owners interchangeably as slip owners or limited partners, as though the terms were synonymous. He said if a limited partner wanted to sell his boat slip, he would help him. Steve indicated that using the term "sell" in reference to a boat slip was typical, although it was a loose use of the term. He explained that he had always used the term "selling" with respect to the transfer of boat slips, and that no one had ever advised him not to use that terminology. He even facilitated the transfer of boat slips for a lawyer at the Marina, and said that the lawyer never corrected his use of the term "sell" with respect to the transfer. (At 842). Steve explained that the reference to "owning" a boat slip is just a figure of speech meaning that the "owner" has the right to exclusive use of the slip for the duration of the Corps lease. He said that the owner also has the right to rent, sell, or transfer the slip, as well as the right to use the patio, the parking lot, and the common areas. He defined "boat slip" as "a hole in the water space, right to

use to moor your boat where you pull it up and tie it up and dock your boat."

When questioned about his part in the sale of boat slip # 13 to the Whites, Steve said that Craig White contacted him months before his visit to the Marina. He said that, when a seventy-foot boat slip became available, he called the Whites. They later came to look at the boat slip and decided that they wanted to purchase it. Steve said that, in such transactions, he normally told prospective boat slip buyers about the Limited Partnership arrangement and gave them a copy of the Limited Partnership agreement and a "Right to Use" form at the time of sale. He said that he gave the Whites a "Bill of Sale," a form used in Early's boat sale transactions, because there were no more "Right to Use" forms in the office. He thought that, at that time, he also gave them a Limited Partnership agreement, but said that if he did not, he had previously given them one to review. Steve did not review the Declaration with the Whites, because he assumed that the Yacht Club association would do that. Because of the Whites' close friendship with Mike Thilmony, a limited partner, Steve thought that the Whites would be well aware of the arrangement at the Marina. He said he told the Whites that they were purchasing the right to exclusive use of the boat slip, the right to transfer it, and the right to sell it. At the time of the sale, Steve saw no indication that the barges were dangerous. In the years prior to the sale, they had required only ordinary repairs.

Kevin Early testified about the sale of his boat slip to the Whites. In February or March 2000, Early purchased slip # 13 for $55,000 from Jim Sherrard. When he purchased the slip, Early was not told anything about a limited partnership. Sherrard told Early about the Yacht Club association, but Sherrard had paid the Yacht Club dues through July 2000. Prior to the trial, Early had never seen the Declaration. At the time Early purchased slip # 13, he received nothing in writing and never signed anything.

Shortly after he bought the slip, Early and his wife decided to move. Consequently, they put their boat and boat slip up for sale. Early put a "for sale" sign on his boat, and he testified that it did not have the term "dockominium" on it. Early said that Herb Pickle told him that he could only sell his slip through Steve or Herb Pickle, so Early allowed them to sell his slip.

Early testified that he first met the Whites on Memorial Day when they were considering purchasing his boat slip. He invited the Whites onto his boat, showed them around, and generally engaged in "small talk." The Whites then went to talk with Steve Pickle. Later, when the Whites decided to purchase Early's boat slip, Steve presented Early with the "Bill of Sale" to sign. Early said he did not expect anything like that, because he did not sign anything when he bought the slip from Sherrard. Early told them that a check from the Whites would be sufficient for him. Nevertheless, because the Whites wanted something in writing, Early signed the "Bill of Sale" and considered it a receipt for the purchase. From the $62,500 purchase price, Early retained $55,000 and paid the Pickles $7,500 in commissions. When asked what he intended to sell to the Whites, Early responded that he intended to sell "[t]he same thing [he] bought two months [prior]. Just a place to park [his] boat." He characterized the boat slip as "an area that you park your boat in" to protect the boat. He had the exclusive right to use it, rent it, or sell it. Early did not believe that he owned an interest in the dock structure itself. In his deposition, Early testified that he sold the

Whites a limited partnership interest. At trial, he said that, until this lawsuit was filed, he had no idea what a limited partnership even was. He explained that "[t]he association and limited partnership, to me, was all one thing.... It was just the group out there. I had no paperwork, never received paperwork, never been explained."

The resource manager of Old Hickory Lake for the Corps of Engineers, Carl Crews ("Crews"), also testified. Crews said that he had been the resource manager since 1993, and was the assistant manager prior to that time. He was responsible for all the land and water that the government managed on Old Hickory Lake, including the Marina. Crews said that his employees inspect the marinas and other facilities with which the Corps has contracts, including Lakewood Marina, to make sure everything is in accordance with the contracts and the applicable laws. He testified about the condition of the barges at the Marina from 1991 until they were ordered removed in August 2000. He said that, whenever a problem would arise with the barges, Herb Pickle would request that Crews send him a letter about the barges so that he could get "action" on the problem. Usually, after the letter was sent, the problem was remedied. Until the problems arose in August 2000, Crews said, the repairs to the barges were not significant. Crews assumed that the limited partners were responsible for maintenance of the barges, but conceded that he did not actually know who was responsible.

Crews identified several inspection reports of the Marina, which were admitted into evidence. A 1999 report mentioned that "[n]o unauthorized uses were observed." Crews said that he did not recall "being involved with limited partners changing slips or anything like that."

Crews identified the September 2000 letter from the Corps of Engineers written to the Pickles, ordering that the barges be removed. He said that, prior to the Pickles' receipt of that letter, Herb Pickle had called the Corps asking the Corps to look at the barges because the barges were having problems. Crews asked a navigation specialist to investigate the barges. The specialist determined that the barges needed to be removed due to concerns that hazardous conditions might cause the barges to sink. After this, Crews attended meetings at the Marina with the Pickles and other limited partners in an unsuccessful attempt to have someone take responsibility for having the barges removed. In the meetings, he advised the parties that the Corps "normally renewed leases.... In a situation of a marina, if they have a 20–year lease, by the time it comes to an end, well, we normally renew that lease."

Crews indicated that the Corps had a positive relationship with the Pickles. He testified he had worked with the Pickles for many years and that, until the Corps determined that the barges had to be removed, the Pickles were "always cooperative" and accommodating to the Corps' requests. Crews said that the Corps' employee responsible for making determinations about lease compliance was Bill Barnes ("Barnes").

Barnes, a Corps of Engineers employee for thirty-one years, testified at trial. He knew the Pickles personally and was familiar with the situation at the Marina. He was involved in drafting the correspondence from the Corps to the Marina throughout the years in question. Barnes testified about the December 1994 letter, stating that vacant boat slips should not be transferred to private individuals. He said that, at that time, the Corps foresaw a different direction for the Marina. Barnes

explained that, over time, the stated direction changed, and that the Corps ended up not prohibiting limited partners from transferring their boat slips to private parties. He noted that the Marina was intended for the use and enjoyment of the public, but stated that the Corps consented to the limited partnership structure of ownership at the Marina. Barnes thought that, in addition to the general rights given to any limited partner under the law, each limited partner received the use of one boat slip. He said that the transfer of a limited partnership interest, i.e. a boat slip, from one limited partner to a new limited partner was not viewed by the Corps as unsatisfactory performance under the lease, so long as a certain number of boat slips were available for public use.

Barnes stated that marina leases are commonly granted by the Corps for twenty-year terms. He testified that, if all conditions at the marinas are acceptable, the leases are usually renewed.

Barnes identified the Corps' September 2000 letter to the Pickles requiring a plan for removal of the barges. He explained that, prior to the fall of 2000, the Corps had been concerned about the long-term viability of the barges, but those concerns were never put in writing. The Corps gave the Pickles some time to either develop a plan for removal of the barges or to resolve their dispute with the Yacht Club over who was responsible for it. By September 2001, the barges had not been removed; as a result, the lease was revoked at that time. But for the failure to remove the barges, Barnes said, the lease at Lakewood Marina would have been renewed. At the time the lease was re-voked, no other aspect of the lease at the Marina was unsatisfactory. This testimony concluded the hearing.

## THE TRIAL COURT'S FINDINGS

■ On February 24, 2004, the trial court issued its Memorandum and Order. In its memorandum opinion, the trial court found in favor of the Whites on the Consumer Protection Act claim against the Pickles and LPI. On that claim, it granted the Whites $125,000 (double the contract price) plus attorney's fees. The trial court also held in favor of the Whites on their claim against the Pickles for fraudulent misrepresentation, awarding them $62,500 for this claim.[6] The trial court determined that the Pickles had (i) falsely represented that the Corps of Engineers' lease had 20 years remaining on its term and (ii) falsely represented that boat slip # 13 was a thing that could be bought and sold. The trial court's findings were based, in part, on its determination that the Whites were credible witnesses, and the Pickles were not. The trial court found specifically that Steve Pickles' testimony was "extremely inconsistent." Despite the trial court's characterization of the Pickles' behavior as "reprehensible," it determined that an award of punitive damages was not appropriate.

The trial court dismissed the fraudulent misrepresentation claim against Early, finding that he had made no omissions of fact or material misrepresentations on which the Whites relied. The trial court found in favor of the Whites, however, on their breach of contract claims against Early and awarded them damages on this

---

6. The trial court stated that the $62,500 judgment for fraudulent misrepresentation was not in addition to the award for violation of the Consumer Protection Act, that it was simply another basis for the award of damages to the Whites. Indeed, whether a plaintiff re-covers under a theory of breach of contract, misrepresentation, or violation of a statute, he or she is entitled to only one recovery. *Shahrdar v. Global Hous., Inc.*, 983 S.W.2d 230, 238 (Tenn.Ct.App.1998).

claim in the amount of $62,500. As the basis for this conclusion, the trial court found that Early "did not convey title to the boat slip as he contracted to do." The trial court held in favor of Early on his cross-claim against the Pickles for common-law negligence, award him a judgment against the Pickles in the amount of $62,500.

The trial court found in favor of all of the defendants regarding the Whites' claim that the defendants knew about, but failed to disclose, the poor condition of the barges. The trial court stated specifically that "[t]he Whites did not prove ... that the condition of the barges was specifically discussed at the time of purchase ... [or] that the dangerous condition of the barges was known to [the Pickles] at the time of the transaction, in late May of 2000." All other claims were dismissed.

The trial court awarded the Whites prejudgment interest. Both Early and the Pickle defendants filed motions to alter or amend, which were denied.[7] Ultimately, the trial court awarded the Whites $69,936 in attorney's fees against the Pickles and LPI, and $5,429 in discretionary costs against Early, the Pickles, and LPI. The Pickles, LPI, and Early now appeal from the trial court's orders.

## ISSUES ON APPEAL

On appeal, the Pickles raise several issues regarding the trial court's decision.[8] They claim that the trial court erred by:

(a) determining that the Pickles made an actionable misrepresentation that the Whites would acquire property rights that did not exist;

(b) determining that Herb Pickle misrepresented that the Corps of Engineers lease had a remaining term of twenty years;

(c) determining that the Whites reasonably relied on any representation made by the Pickles concerning the property interest that they were purchasing from Early, or that they reasonably relied on any comment regarding the duration of the Corps of Engineers lease;

(d) concluding, as a matter of law, that reasonable reliance is not required for liability under the Consumer Protection Act;

(e) finding that the alleged misrepresentations made by them were the legal cause of the Whites' damages;

(f) concluding that the Whites were entitled to double or treble damages under the Consumer Protection Act; and

(g) determining that LPI was liable for any misrepresentations of Herb or Steve Pickle in connection with the Whites' purchase of Early's boat slip.

Early also challenges the trial court's ruling, adverse to him, arguing that the trial court erred in finding that he had no property interest to convey to the Whites and that, therefore, he failed to convey ownership of the boat slip to the Whites as he had contracted to do. Early further argues that the trial court erred in holding him liable for prejudgment interest.

## ANALYSIS

We review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn.1997); T.R.A.P. 13(d). We review the trial court's conclusions of law *de novo*,

7. The trial court granted Early's request to reduce the percentage of prejudgment interest from 10% to 5%.

8. Any argument on appeal attributed to the Pickles applies equally to LPI unless otherwise noted.

with no such presumption of correctness. *Ganzevoort,* 949 S.W.2d at 296. Because the trial court is in the best position to assess the credibility of the witnesses at trial, we give its credibility determinations great weight on appeal. *Walton v. Young,* 950 S.W.2d 956, 959 (Tenn.1997).

### FRAUDULENT MISREPRESENTATION— PROPERTY INTEREST

We first address the Pickles' argument that the trial court erred in holding that the Pickles misrepresented to the Whites that Early had a property interest to sell to the Whites when, in fact, he did not. The trial court stated:

> The Court finds that the Whites did not buy an interest in a boat slip, in real property, in the lease, or in a limited partnership. They paid substantial purchase funds for a space at the marina that became inaccessible to them almost immediately after the transaction. Early thought he could sell the boat slip he had recently purchased, but contrary to his belief, he had no property interest to transfer to the Whites. If the Whites had been partners in the Limited Partnership, they would still have no property interest in the boat slip.

The trial court characterized Early's property interest in boat slip # 13 as "illusory," and stated that Herb Pickle "created and promoted the myth that slips could be purchased." The trial court indicated that ownership of the slip could not be conveyed, because the letters to the Pickles from the Corps of Engineers admonished the Pickles not to sell the vacated slips of former limited partners to individual private owners.[9] The trial court found that, by promoting boat slip sales and collecting commissions on the sales, the Pickles "jeopardized the lease."

On appeal, the Pickles argue that the trial court erred in its conclusion that Early did not have a valuable property interest to convey, because (1) the history of boat slip sales at the Marina shows that slip owners acquire a bundle of rights upon the purchase of a slip; (2) the Whites were never told, and they did not expect, that they would acquire an interest in the dock structure itself or in the tangible marina property; (3) the definition of "boat slip" does not refer to any interest in the structure or other tangible property; (4) the Whites acquired actual property rights and interests that had real value when they bought slip # 13; (5) the Whites knew that their interest in slip # 13 was subject to continuation of the Corps lease; and (6) the Corps permitted the transfer of the slips to private individuals. The Pickles point out that, despite the old correspondence cited by the trial court in its Memorandum Opinion, the testimony from Corps' representatives showed that the Corps acquiesced in limited partners selling their vacated slips to private owners, so long as the total number of privately-owned slips did not exceed forty-four.

In response, the Whites argue that what they received from Early was different from what they thought they were buying. They claim that the Pickles told them that they were buying a boat slip, free and clear of liens and encumbrances, *not* a limited partnership interest and *not* something contingent upon restrictions and covenants on file with the Register's Office. They assert that the ownership of a limited partnership interest has legal ramifications that would make information regarding the limited partnership material to a purchaser. In addition, the Whites argue, the Declaration contained important informa-

9. This conclusion is based on the trial court's opinion as a whole, not only on the section

dealing with the fraudulent misrepresentation claims.

tion that they needed to know when they were making the decision to invest at the Marina. They note that the Pickles never informed the Whites of the Limited Partnership and the Declaration, and claim that they would not have bought the slip had they known about the documents. The Whites thought that the ownership structure was akin to a condominium complex, in which individuals owned units with common ownership of other areas. They assumed ownership of the physical structures, including ownership of the dock structure, although they concede they knew they could not have taken away their slip to use it separately. Thus, the Whites maintain that the nature of their ownership in the slip was misrepresented by the Pickles, and they relied on the misrepresentations to their detriment.

At the outset of our analysis, we note that the trial court did not conclude that the Pickles misrepresented the nature of Early's ownership to the Whites, or that the Pickles committed fraud by failing to disclose details regarding the Limited Partnership or the Declaration. Rather, the trial court found that Early had nothing to transfer, and that his interest in slip # 13 was illusory. Therefore, we must examine whether Early owned any property or other interest that was transferable to the Whites.

The appellate record contains no documentation regarding boat slip ownership at the Marina or the "bundle of rights" that are part of that ownership. The only writ-

ing indicating who owns which slip is the admittedly outdated September 2000 directory of the Yacht Club. When the Limited Partnership was created, LPI and each of the fifteen limited partners signed the Limited Partnership agreement, which set out the general duties and rights for the general and limited partners. The agreement states that the Limited Partnership was formed to "engage in the business of developing and leasing dock slips at said location and in such other business of a similar nature. . . ." It does not elaborate on any rights or responsibilities consistent with such ownership.

According to the unwritten understanding of the parties, each of the limited partners acquired not only an interest in the business of the limited partnership but also an interest in one or more of the Marina's boat slips. From the undisputed testimony at trial, this ownership included not only exclusive use of the designated boat slip, but also the right to use the patio on the barge across from the slip as well as the parking lots and other common areas. Each limited partner's right as a boat slip owner was separate and distinct from his proprietary right as a limited partner.[10] Though it came to be expected that each boat slip owner would join the Yacht Club and pay the monthly fee, Yacht Club membership was not explicitly required. The Declaration did not affect the proprietary rights of a limited partner. They only set out rights and responsibilities of Yacht Club members, that is, boat slip owners who voluntarily joined.

**10.** According to the Tennessee statutes on the subject, a limited partner may assign his interest to another, either in whole or in part. T.C.A. § 61–2–702(a)(1) (2002). If the limited partner assigns his entire limited partnership interest, he ceases to be a partner. T.C.A. § 61–2–702(a)(4) (2002). An assignee may become a limited partner to the extent that the agreement so provides or to the extent that all partners consent. T.C.A. § 61–2–

704(a) (2002). Under the limited partner agreement at issue, "the assignee shall have the right to become a substituted Limited Partner and entitled to all the rights of the assignor if the General Partner consents thereto." Nothing in the record suggests that the limited partners in this case assigned their partnership rights to other parties, or that the general partner purported to consent to any such assignment.

■ Early's chain of title to boat slip #13 is not disputed. Rather, the value of the interest he possessed was determined to be illusory. Therefore, we look at whether Early owned anything of value that was transferrable to the Whites.

Early never acquired an interest in the Limited Partnership and, in fact, was unaware of the existence of the Limited Partnership until this lawsuit began. Likewise, he never had an interest in the real estate at the Marina. The dock structures and the surrounding real estate continued to be owned either by the Limited Partnership or by LPI. The undisputed testimony showed, however, that Early enjoyed exclusive use of boat slip #13, along with the patio, parking and common areas, and the entire "bundle of rights" that went along with that exclusive use. He had the ability to use, rent, or transfer this interest. Early's exclusive right to use, rent or transfer this interest was not only asserted by him, it was recognized by those using Lakewood Marina. Moreover, the ownership rights of the boat slip owners were recognized by the Corps of Engineers as well. The correspondence from the Corps of Engineers does not indicate that limited partners or boat slip owners did not have rights to transfer; rather, it expressed disapproval of such transfers and indicated that, if they took place, it would be considered as a factor in the Corps' decision on whether to renew the Marina lease.

To be sure, the owners' rights in the boat slips were subject to the Corps of Engineers lease, as was widely known. The fact that these rights were conditioned on continuation of the Corps lease makes them conditional, but not illusory. It clearly impacted their value, but did not render ownership of a boat slip devoid of any value whatsoever.

The boat slip owners, including Early and the Whites, were aware that they did not own an interest in any real property. They point this out as a reason for not checking the Register's office for any documents pertaining to the slip. This does not mean, however, that Early did not have a property interest with real value. Tennessee courts have subscribed to an expansive view of property rights:

> The concept of the right of property is multi-faceted. It has been described as a bundle of rights or legally protected interests. These rights or interests include (1) the right of possession, enjoyment and use; (2) the unrestricted right of disposition; and (3) the power of testimonial disposition.

> In its broadest sense, property includes all rights that have value. It embodies all the interests a person has in land and chattels that are capable of being possessed and controlled to the exclusion of others. Chattels include intangible personal property such as choses in action or other enforceable rights of possession.

*State ex rel. Elvis Presley Int'l Mem'l Found. v. Crowell,* 733 S.W.2d 89, 96–97 (Tenn.Ct.App.1987) (citations omitted). Craig White testified that boat slips on Old Hickory Lake similar to slip #13 rent for about $500 per month. In fact, after the Whites purchased boat slip #13 from Early, the Whites rented their slip to a third party for $350 per month for several months.

On these facts, we must conclude that the evidence preponderates against the trial court's finding that the rights owned by Early were illusory and devoid of value. We find that Early owned valuable property rights, and that those rights were transferrable to the Whites. This being the case, we must conclude that the Pickles' representations that Early had a transferrable property interest were not false, and that those representations do not support

a claim of fraudulent misrepresentation by the Whites against the Pickles.

## CAUSATION

■ To recover damages for their claims that the Pickles and LPI had engaged in fraudulent conduct or had committed unfair or deceptive acts in tort or within the meaning of the Tennessee Consumer Protection Act, the Whites must show that the Pickles' and LPI's wrongful conduct proximately caused their injuries. *See Prudential Botts & Assocs. Realtors, Inc. v. R & E Props., LLC*, No. E2002–01827–COA–R3–CV, 2003 WL 21493792, at *1 (Tenn.Ct.App. June 25, 2003); *Milliken v. Crye–Leike Realtors*, No. M1999–00071–COA–R3–CV, 2001 WL 747638, at *6 (Tenn.Ct.App. July 5, 2001); *see also Harvey v. Ford Motor Credit Co.*, No. 03A01–9807–CV–00235, 1999 WL 486894, at *2 (Tenn.Ct.App. July 13, 1999); *Stracener v. Swindle*, No. 01A01–9502–CH–00047, 1995 WL 414873, at *3 (Tenn.Ct.App. July 14, 1995). Therefore, we examine the trial court's finding that the Whites' damages—their inability to access their boat slip—resulted from the unfair and deceptive practices of the Pickles and LPI. The trial court found that the Whites would not have purchased the boat slip had the Pickles not represented that they would be able to use it for twenty years, and they certainly would not have purchased it had they known that Early had no valuable interest to convey. Therefore, we must analyze the evidence supporting this finding.

It is undisputed that the Whites were aware that the existence of the Marina, and their exclusive rights to use boat slip #13, were subject to the continuation of the Corps of Engineers lease. Craig White acknowledged that he was aware that "nothing happens on that water without the Corps being involved," and that "it's common knowledge on the water that the Corps of Engineers controls everything that happens on the water." He and Karmen both conceded that they knew that the continued existence of the boat slip was subject to the continuation of the Corps of Engineers lease that allowed the Marina to exist. Craig White admitted that, from personal experience, he knew that leases usually gave the landlord the right to terminate the lease if the tenant failed to do certain things.

The evidence is also undisputed that the Corps of Engineers terminated the Marina lease because of the failure to remove the deteriorating barges. The trial court specifically concluded that, at the time the Whites purchased boat slip #13, the Pickles did not know that the barges were in such poor condition that the Corps would require their removal. Therefore, the Pickles could not be held liable for failing to disclose this fact to the Whites.

The trial court emphasized the correspondence from the Corps to the Pickles in 1993 and 1994, indicating that the Corps would not approve the resale of boat slips to other private owners, in light of the Corps' desire that the Marina remain open to the public. However, unrebutted testimony from Corps' representatives showed clearly that the Corps' position had evolved, and that the Corps acquiesced in the transfer of boat slips so long as the total number did not exceed forty-four. There was no evidence that Early's transfer of his boat slip to the Whites was in contravention of this standard. Most importantly, the uncontroverted testimony from the Corps' representatives was that, were it not for the unforeseen barge controversy, the Corps lease on the Marina would very likely have been renewed for another twenty-year term. The Whites did not dispute this testimony, and the

trial court made no finding that it was not credible.

Clearly, then, the Whites' damages—their inability to use the boat slip they purchased—was caused by the failure of a condition of which they were admittedly aware, namely, continuation of the Corps of Engineers lease. The statements made by the Pickles to the effect that the lease with the Corps "will be here for another twenty years" and their failure to disclose the 2005 lease renewal date cannot be found to have caused the Whites' damages if, in fact, the lease would have been renewed but for intervention of the unforeseen barge controversy.

The Whites' use and enjoyment of their boat slip did not cease because of the expiration of the Corps lease in 2005, or because someone else claimed title to their slip. In fact, the undisputed evidence shows that the lease would have been renewed in 2005 if the conditions had stayed the same as they were in 2001, and they would have enjoyed the use of the slip during the interim. Thus, the representations by the Pickles did not cause the damages suffered by the Whites. The Whites were aware that their continued enjoyment of the boat slip was conditioned on continuation of the Corps lease, and the Corps lease was terminated based on the condition of the barges, a fact which the trial court found the Pickles were unaware of at the time of the sale. Therefore, we must conclude that the trial court erred in holding that the Whites' damages in tort or under the Tennessee Consumer Protection Act were caused by the alleged misrepresentation that the Corps lease would be in existence another twenty years.

### FRAUDULENT MISREPRESENTATION ON TERM OF CORPS LEASE

Our holding on the issue of causation makes it unnecessary to address the issue of whether the Pickles' statements to the effect that the Corps lease "will be here for another twenty years" is a representation of present fact or prediction of a future event. The undisputed evidence shows that the Whites' damages were caused by the barge dispute, which would have occurred regardless of the expiration date of the Corps lease. Therefore, this finding by the trial court must be reversed.

### TENNESSEE CONSUMER PROTECTION ACT

■ The trial court found that the conduct of LPI and the Pickles constituted a violation of the Consumer Protection Act because the Whites suffered "an ascertainable loss of money or property ... as a result of the use or employment by another person of an unfair or deceptive act or practice. . . ." T.C.A § 47–18–109(a)(1) (2001). The trial court relied primarily on the alleged misrepresentations that (1) Early had valuable rights that could be transferred, and (2) the Corps lease had another twenty years remaining on its term. Both of these findings are addressed above. In addition to these two misrepresentations, however, the trial court also found that the Pickles and LPI "were regularly involved in offering and closing boat slip contracts at the marina," and that LPI "promoted and managed the marina so that it looked enough like a condominium or other property interest to attract buyers." The trial court noted the Corps' 1994 correspondence stating its intent to keep the Marina open for public use and indicating disapproval of further transfers of boat slips. Despite this, the Pickles continued to promote the sale of boat slips they were not permitted to sell. By collecting commissions on the boat slip sales, the Pickles and LPI jeopardized the Corps lease for their own benefit.[11] From

---

11. In other words, they promoted a "dockom-

inium" type of arrangement, where the boat

this conduct, the trial court concluded that "the Whites' loss was the result of an unfair or deceptive act or practice" within the meaning of the Tennessee Consumer Protection Act.

Thus, the trial court was persuaded that, because the Corps of Engineers had expressed its desire that the Marina remain available to the public to a certain degree, the Pickles were not authorized to promote or sell the private use of vacated boat slips to other individuals and that they jeopardized the Corps lease by continuing to do so. As noted above, however, the testimony of Corps' representatives Bill Barnes and Carl Crews belie this conclusion. They indicated clearly that, so long as a certain number of boat slips were kept available for public use, private boat slip sales were allowed, and that, had the conditions which existed in 2000 remained the same in 2005, the Corps would have renewed its lease at the Marina for another twenty years. More importantly, even if the Pickles' sale of boat slips were contrary to the Corps' directive, the undisputed evidence showed that the Corps lease was in fact terminated because of the barge controversy, not because of the transfer of boat slips. Therefore, the Pickles' alleged scheme to sell boat slips they were not allowed to sell did not in fact cause the Whites' damages. As noted above, in order to recover under the Tennessee Consumer Protection Act, the alleged "unfair or deceptive act or practice" must in fact cause the damages of which the plaintiff complains. *Prudential Botts & Assocs. Realtors, Inc.*, 2003 WL 21493792, at *1. Therefore, the trial court's holding under the Act must be reversed.

### BREACH OF CONTRACT

Early argues on appeal that the trial court erred in determining that he breached his contract with the Whites to sell them boat slip # 13. The trial court concluded that Early breached his contract with the Whites because he warranted that he had "good title" to the slip and that he had the power and right to convey the slip when, in fact, he did not have such an interest to convey. The trial court reiterated its earlier conclusion that "[c]ontrary to the contract bill of sale, Early did not convey title to the boat slip as he contracted to do." The trial court also stated that "the thing [Early] sold was a bundle of obligations, if anything at all," and that "Early was not the owner of anything of value, [and] harm occurred when Early signed the Bill of Sale and accepted the purchase funds."

Our holding that Early, in fact, owned valuable transferrable rights to boat slip # 13, which were not illusory, mandates reversal of the trial court's finding of breach of contract. All parties understood that the rights acquired were not title to real estate and that such rights would be subject to the Corps lease. With this understanding, the Whites willingly bought the boat slip.[12] For these reasons, we

---

slips are sold along with ownership in the surrounding real estate. *ABKA Ltd. P'ship v. Wis. Dep't of Nat'l Res.*, 247 Wis.2d 793, 635 N.W.2d 168, 172–73 (App.2001), *aff'd on other grounds*, 255 Wis.2d 486, 648 N.W.2d 854, 857 n. 1 (2002); *see also Blackstock v. Kohn*, 994 S.W.2d 947, 949 (Mo.1999) ("Dockominiums are boat docks that are individually owned."); *Island Venture Assocs. v. N.J. Dep't of Envtl. Prot.*, 359 N.J.Super. 391, 820 A.2d 88, 89 n. 1 (2003).

**12.** Contrary to the Whites' argument on appeal, Early did not sell, and the Whites did not purchase, any interest in the Limited Partnership. Any obligations the Whites acquired a result of their membership in the Yacht Club were acquired of their own volition when they began paying dues. The Limited Partnership and the Yacht Club are separate and distinct.

must conclude that the trial court erred in finding that Early breached his sales contract with the Whites, and this finding is reversed.

All other issues raised in this appeal are pretermitted. We recognize that disputes may still exist among the Pickles, the Limited Partnership, the Whites, the other Yacht Club members, and perhaps others. Our decision, however, is limited to this controversy and the issues that were raised in this appeal.

### CONCLUSION

We reverse the decision of the trial court and dismiss the Whites' complaint against Early, the Pickles, and LPI. Costs on appeal are to be taxed to Appellees Craig and Karmen White, for which execution may issue, if necessary.