IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 4, 2010 Session

## CASCADE OHIO, INC., DBA C. W. OHIO, INC. V. MODERN MACHINE CORPORATION, A TENNESSEE CORPORATION, ET AL.

**Appeal from the Chancery Court for Bradley County**
**No. 04-054      Jerri S. Bryant, Chancellor**

---

**No. E2009-01948-COA-R3-CV - FILED NOVEMBER 15, 2010**

---

Cascade Ohio, Inc., doing business as C. W. Ohio, Inc. ("the Customer"), sued Cullom Machine Tool & Die, Inc., now known as CMTD, Inc. ("the Seller"), and Modern Machine Corporation, a Tennessee corporation ("Modern Tennessee" or "the Buyer"), regarding a machine that the Seller had agreed to build for the Customer. After the Seller agreed to build the machine, the Seller entered into an agreement with the Buyer to sell its assets to the Buyer, including the Seller's contract to build the machine for the Customer. The machine was never built, prompting this lawsuit. Following a bench trial, the court held that the Seller and Buyer were liable to the Customer for the down payment made on the machine purchase. The court further held that the Buyer was liable to the Customer under the Tennessee Consumer Protection Act ("the TCPA"), trebled the Customer's damages, and held the Buyer responsible for the attorney's fees of the Customer. The court also held the Buyer liable to indemnify the Seller, including the attorney's fees of the Seller. The court also pierced the corporate veil of the Buyer and held parties related to the Buyer jointly liable with the Buyer. The Buyer and its related parties appeal. We reverse in part and modify in part. Except as modified or reversed, the judgment is affirmed. Case remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Modified in Part and Reversed in Part; Unreversed Portion of Judgment Affirmed
as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Cameron S. Hill, Clinton P. Sanko and Edward N. Boehm, Jr., Chattanooga, Tennessee, for the appellants, Modern Machine Corporation, a Tennessee corporation, Modern Machine Corporation, a Florida corporation, and John Sonnentag.

Robert S. Stone and David L. Hill, Knoxville, Tennessee, for the appellee, Cascade Ohio, Inc., dba C. W. Ohio, Inc.

Lynda M. Hill, Chattanooga, Tennessee, for the appellees, CMTD, Inc., formerly known as Cullum Machine, Tool & Die, Inc., Heinrich B. Dickhut, and Karen Dickhut.

**OPINION**

I.

The following is a further recitation of the facts and procedural history of this case. It is presented here to give the reader more specifics before the Court embarks upon a detailed examination of the facts, procedural history, and the holdings and decrees of the trial court.

After a demonstration at the Seller's plant, the Seller agreed to build and the Customer agreed to purchase a corrugating machine ("the Cascade contract"). Shortly thereafter, the Customer signed papers and tendered a down payment in the amount of $113,290. After the contract was signed but before the machine was built, the Customer declared the project "dead" unless and until the Seller could demonstrate that the machine to be built would produce a finished product of the same quality as the one produced by the machine used by the Seller in its demonstration. Before the new demonstration could take place, the Seller executed an agreement to sell its assets to Modern Tennessee. The documentation of the Buyer's purchase of the assets included an assignment of the Cascade contract to the Buyer, and an agreement to escrow a portion of the purchase price to protect the Buyer from undisclosed obligations of the Seller. In fact, the Seller did not disclose to the Buyer that a dispute had arisen with the Customer. The Buyer first learned of the dispute from the Customer after it, the Buyer, signed the asset purchase agreement ("the APA") with the Seller and after it closed on the sale, but before the expiration of a due diligence period, a period during which the Buyer had the option of terminating the APA.

The Buyer did not build the corrugating machine and the Customer filed this action against the Seller and the Buyer demanding a return of its down payment. The Seller and the Buyer filed cross-claims against each other and also joined the principals of these entities on various theories; included was a claim by the principals of the Seller, Mr. and Mrs. Dickhut, for unpaid rent on a building they owned that the Buyer occupied. The Customer eventually amended its complaint to add two new defendants – the sole shareholder of the Buyer, John Sonnentag, and Modern Machine Corporation, a Florida corporation ("Modern Florida"), upon learning that Modern Tennessee and Modern Florida had transferred their assets to insiders and dissolved. The Seller also amended to add claims against Modern Florida and Sonnentag. The Customer dismissed all claims against the Seller other than the breach of contract claim and aligned itself with the Seller in claiming that the Buyer took an

-2-

assignment of the Cascade contract knowing full well that it, the Buyer, did not intend to perform. The Customer and the Seller both claimed that the Buyer's actions violated the TCPA, Tenn. Code Ann. § 47-18-101 et seq. (2001 and Supp. 2009). After a bench trial, the court filed a lengthy memorandum opinion and entered judgment as we have described.

## II.

Up until the time of the sale of its assets to Modern Tennessee, the Seller was in the business of manufacturing corrugating machines used to form plastic products. The Customer was, and remains, in the business of manufacturing building products including plastic porch columns. The Customer became interested in purchasing a corrugating machine capable of forming plastic porch columns with both a round and square profile.

The Customer's interest led to a demonstration at the Seller's plant in Cleveland, Tennessee. The Customer, through its president, Nick Noirot, made it clear that it needed a machine that would minimize the "parting lines" on the finished product. A "parting line" is the line formed on plastic products where the mold, which gives form to melted plastic, comes together. The Seller, as admitted by its general manager, Chris Turner, understood that the Customer expected a machine that would minimize the parting lines. The first demonstration produced samples that were unacceptable to the Customer because the parting lines were too visible. The Seller's employees then made some adjustments and produced acceptable quality samples. The Seller's general manager, Turner, explained to Noirot that one feature of the machine being demonstrated was two drives, one that pushed the mold and one that pulled the mold along the length of the column being formed. Although the Seller did not tell the Customer that the machine to be built would have two drives, Noirot left the Seller's plant under the impression that all corrugating machines built by the Seller used two drive units.

Noirot's understanding was not correct. The machine that was demonstrated employed two drives only because it was a vertically-oriented machine that needed a second drive to overcome the effects of gravity. The Customer needed a horizontally-oriented machine because its facility would not accommodate a vertically-oriented machine. The Seller gave the Customer a quote dated April 7, 2003, to build a "ConVac H-4-52 horizontal continuous vacuum forming machine" for $283,225. On May 7, 2003, the Customer issued a purchase order to the Seller for a "Convac H4-52 Continuous vacuum forming machine and

-3-

accessories per attached April 7, 2003 quote." On May 2, 2003, the Seller executed a "Purchase Agreement" ("the PA")[1] dated March 17, 2003, for a corrugator "listed in the attached quotation . . . subject to the terms and conditions set forth in this [PA]." The Customer executed the same document on May 7, 2003, and mailed it to the Seller on May 8, along with its purchase order and a check in the amount of $113,290 representing a down payment of 40%. The terms and conditions of the PA pertinent to this dispute are as follows:

> [The Customer] shall approve the [Seller] prepared *project definition form* for the [corrugator] prior to [the Seller] manufacturing the [corrugator]. . . .
>
> * * *
>
> In the event of cancellation by [the Customer]:
> (a) Any items completed at the time of receipt of a written cancellation notice will be shipped and invoiced at full price. [The Customer] agrees to pay full price for any such items within 30 days of the shipment date.
> (b) Work on the balance of the order will be stopped as promptly as reasonably possible, and [the Customer] shall pay to [the Seller] an amount sufficient to cover all actual expenditures, commitments, liabilities and costs made or incurred by [the Seller] in respect to such incomplete items, plus a reasonable profit on such items.
>
> [The Seller] warrants . . . the [corrugator] manufactured to be free from defects in workmanship and material when used under conditions recommended by [the Seller] . . . .
>
> * * *
>
> [The Customer] acknowledges that [the Seller] has not made and does not make any warranty or representations, either expressed or implied, or any kind whatsoever with respect to the ultimate product which may be obtained from the [corrugator]. [The

---

[1] We have previously defined the deal between the Customer and the Seller as "the Cascade contract." We introduce the new term, "the PA," for use in the more narrow sense of the written purchase agreement dated March 17, 2003. The new term is necessary because a key part of this case is whether the "the Cascade contract" is broader in its terms than the terms of the PA.

Customer] acknowledges that the quantity and quality of the product it manufactures from the use of this [corrugator] is within its control and therefore [the Customer] expressly releases [the Seller] from any obligation or liability with respect to said products.

. . . . THIS WARRANTY IS EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, WHETHER STATUTUORY [SIC] OR OTHERWISE, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.

* * *

This Agreement represents the entire agreement of the parties and supersedes all previous discussions, representations, negotiations and writings. No Amendment to this Agreement is valid unless it is in a written instrument that is signed by authorized representatives to this Agreement. A course of conduct shall not be deemed an amendment to this Agreement.

(Headings omitted; capitalization in original; emphasis added.)

In the course of examining the "project definition," the Customer discovered that the corrugator described by the Seller employed only a single drive. Noirot contacted Turner on May 30, 2003, to discuss the problem of only one drive unit in the project definition. Turner told Noirot that a single drive unit would work for the Customer on a horizontally oriented corrugator. Noirot was not satisfied that a single drive horizontal unit would perform as well as the one previously demonstrated, *i.e.*, a dual drive corrugator, and he declared that the project was "dead" until the Seller could demonstrate that a single drive could produce samples as good as those produced by the dual drive corrugator. On behalf of the Seller, Turner agreed to disconnect one of the drives in the corrugator used previously and simulate a single drive corrugator. He scheduled a demonstration for June 3, 2003. However, he was unable to meet this schedule because he was terminated on the 3rd, after a change in management that will be explained as we continue.

Noirot would later testify that he did not care how many drives the corrugator employed as long as it could produce columns of equal quality to those produced in the earlier demonstration. He further testified that he probably would have paid the additional

cost of a second drive unit. Turner testified at trial that the cost of drive units varies but that the one for this application would have been approximately $5,000. The president of the Seller, Ms. Boettner, testified that she would have absorbed the cost of a second drive unit if that is what it would have taken to make the corrugator satisfactory.

As of April 2003, John Sonnentag owned 100% of the stock in a Florida corporation named Modern Machine Corporation. On May 13, 2003, he formed a new Tennessee corporation with the same name for the express purpose of establishing an entity to receive the assets of the Seller that he was planning to purchase. On May 28, 2003, Modern Tennessee executed an asset purchase agreement – previously identified in this opinion as "the APA" – with the Seller and its two shareholders, Heinrich B. Dickhut and Karen Dickhut (collectively "the Shareholders"). The essence of the deal was that Modern Tennessee purchased all of the Seller's assets, excepting those specifically excluded, and none of the Seller's liabilities, excepting those specifically included, for the sum of $1,850,000. Among the excluded assets was "all cash." As relates to this dispute, the Seller was allowed to keep the down payment of $113,290 tendered by the Customer. The APA provides that

> in no event shall [Modern Tennessee] assume or incur liability or obligation of . . . any warranty work . . . regardless of when made or asserted, which arises out of or is based upon any express or implied representation, warranty, agreement or guarantee made by [the] Seller, or alleged to have been made by [the] Seller, or which is imposed or asserted to be imposed by operation of law, in connection with any service performed or product sold . . . by or on behalf of [the] Seller on or prior to the Closing Date [of the APA] . . . .

The APA includes a catch-all excluding "any other liability or obligation not listed on Schedule 1.4."

The liabilities that Modern Tennessee assumed are listed in the same section 1.4 of the APA and an attached schedule 1.4. Section 1.4 of the APA states that

> [The Buyer] shall assume and agree to perform and shall indemnify, defend and hold [the] Shareholders and [the Seller] and its officers, directors and agents harmless for only those liabilities and obligations listed in Schedule 1.4 arising under [the Seller's] open purchase orders for the manufacture of machinery and equipment, goods and services that were

received or ordered in the ordinary course of business but not yet shipped by [the Seller] or delivered to [the Seller] prior to the Closing Date [of the APA]. . . .

Section 1.4 imposes on the parties an obligation to attempt to agree, prior to closing, on the stage of completion of any unfinished projects assumed by Modern Tennessee, and whether Modern Tennessee is entitled to a credit against the purchase price for monies the Seller had in hand at closing over and above the work it had done. Section 1.4 also covers the possibility that the parties could not agree:

> Notwithstanding anything in [the APA] to the contrary, if, in spite of the good faith efforts of [the Seller] and [the Buyer], such parties cannot agree as to the completion stage of the products to be delivered pursuant to the Assumed Liabilities on or before June 15, 2003, either [the Seller] or [the Buyer] shall have the right, in its sole and absolute discretion, to terminate this Agreement, and in the event of such termination, this Agreement will be null and void and of no further effect.

Schedule 1.4 lists, as one of the "assumed liabilities," the "[Cascade] contract dated March 17, 2003."

The APA included an attached Assignment and Assumption Agreement, the pertinent terms of which are:

> [The Seller] hereby assigns, sells, transfers and sets over . . . to [the Buyer] all of [the Seller's] right, title, benefit, privileges and interest in and to, and all of [the Seller's] burdens, obligations and liabilities in connection with, each of the Assumed Liabilities (as such term is defined in Section 1.4 of [the APA]). [The Buyer] hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants, and to pay and discharge all of the liabilities of [the Seller] to be observed, performed, paid or discharged from and after the Closing, in connection with the Assumed Liabilities. [The Buyer] assumes no retained liabilities specified in Section 1.5 of [the APA], and the parties hereto agree that all such retained liabilities shall remain the sole responsibility of [the Seller].

The terms of [the APA], including but not limited to [the Seller's] representations, warranties, covenants, agreements and indemnities relating to the Assumed Liabilities, are incorporated herein by this reference. [The Seller] acknowledges and agrees that the representations, warranties, covenants, agreements and indemnities contained in [the APA] shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of [the APA] and the terms hereof, the terms of [the APA] shall govern.

(Headings in original omitted.)

Article 6 of the APA imposes mutual indemnification obligations on the parties. In Section 6.1, the Seller and the Shareholders are required to "reimburse, indemnify and hold harmless" the Buyer against damages, losses and expenses that

result from, relate to or arise out of:

(a) any and all liabilities and obligations of [the Seller] or Shareholders of any nature whatsoever arising prior to the Closing, except for those liabilities and obligations which [the Buyer] specifically assumes pursuant to this Agreement;

\* \* \*

(c) any misrepresentation, breach of warranty or nonfulfillment of any agreement or covenant on the part of [the Seller] or Shareholders under this Agreement . . .

Likewise, Section 6.2 requires the Buyer to "reimburse, indemnify and hold harmless [the Seller] and [the] Shareholders" against damages, losses and expenses that "result from, relate to or arise out of . . .any and all liabilities and obligations . . . which have been specifically assumed by [the Buyer]." Each party assumes the obligation of the other's costs and expenses, including "reasonable legal fees and expenses" incident to or incurred in enforcing the right of indemnification.

Section 8.11 of the ASA also requires that $185,000 of the purchase price be placed in escrow to cover "[a]ny liability or obligation of [the Seller] or [the] Shareholders . . . in connection with this Agreement or the transactions contemplated hereby . . . ." Pursuant to

section 8.11, an executed escrow agreement was attached to the ASA.  Section 3 of that document states that

> the Escrow Fund is created as security to indemnify, defend, and hold harmless [the Buyer] from and against . . . all claims . . . losses, damages, costs and expenses (including interest, penalties and reasonable attorneys' fees and disbursements) . . . arising out of or resulting from: (a) the breach of any warranty or representation of [the] Seller or of any covenant, obligation, condition or agreement of [the] Seller to be performed, fulfilled or complied with pursuant to . . . the [APA] by [the] Seller; or (b) any excluded liabilities pursuant to the [APA].

On June 3, 2003, the Seller and the Buyer closed on the APA.  On June 2 and 3, the parties met regarding the status of completion of the projects being assumed by the Buyer, and reached a consensus that the status was as represented by the Seller.  However, immediately before the closing, the Buyer asked the Seller to reduce the purchase price by the full amount of the Customer's down payment, *i.e.*, $113,290.  The Seller declined but agreed to a reduction of $50,000.

As we have stated, the Seller's general manager, Turner, had planned a demonstration for the Customer on June 3, 2003, but the demonstration did not occur because Turner was terminated by the Buyer on that day.  The termination came as a complete surprise to Turner.  He did not inform the Buyer of his conversation with the Customer wherein Noirot had declared the project dead.  The Buyer first learned of the problem with the Cascade contract on or about June 8, 2009, when  Gary Karr, president of the Buyer, called the Customer to advise that the Buyer would be building the corrugator.  During that conversation, Noirot told Karr that the Customer would not accept a single-drive corrugator until it was demonstrated that a single-drive machine would produce a product of comparable quality to that produced by the earlier demonstration with the vertical, dual-drive corrugator.  Karr undertook to produce samples of square columns and delivered them to Noirot.  Noirot deemed the samples clearly defective.  Karr advised Noirot that the Buyer could not manufacture a machine that produces an acceptable finished product without utilizing additional drives, and that the cost of such a machine would substantially exceed the cost of the machine the Seller had agreed to build.  Noirot asked that the Buyer refund the Customer's down payment.  Shortly thereafter, on or about June 12, 2003, Sonnentag reported to the President of the Seller that there were "big problems" with the Cascade contract.  Nevertheless, the Buyer did not exercise its right to declare it null and void pursuant to section 1.4 of the APA.  The reason was that there were things of value that the Buyer wanted other than the Cascade contract, including patents, the company name, and the Seller's line of products.

At that point, a campaign of letter writing by the attorneys for the respective parties began. The Buyer's attorney wrote the Seller's attorney on July 10, 2003, stating that the Buyer was making a claim for indemnification pursuant to the APA. The letter stated that the machine quoted to the Customer would not do what the Customer needed without substantial modifications, especially for square columns, and was therefore "underbid." The Customer's position in further discussions with the Buyer on July 14, 2003, was that if the Buyer built the corrugator and it "doesn't perform we [,the Customer,] will not pay the final 30% payment and [the Buyer] will be out roughly another $75K." At this point, Sonnentag did not doubt the Buyer's ability to manufacture the corrugator, but considered the Cascade contract to be "dead in the water." In a July 31, 2003, letter to the Customer's attorney, the Buyer's attorney called upon the Customer to share in the costs of further research and development, especially with regard to the square column application, if the Customer wished to proceed with the project. In a letter dated August 18, 2003, the Customer's attorney advised the Buyer's attorney that the Buyer had repudiated the Cascade contract by failing to provide assurances that it could produce the machine for which the Customer had contracted, and demanded the return of the Customer's down payment. In a letter dated August 27, 2003, the Buyer's attorney advised the Seller's attorney that "Modern is continuing to build the corrugator Cullom contracted to build and will tender it to [the Customer] when completed. Obviously, [the Customer] will not accept the tender." Therefore, the Buyer's attorney argued that the Seller should cooperate with the Buyer to resolve the dispute with the funds left in escrow. In a letter dated September 15, 2003, the Buyer advised the Customer's attorney that "the machine . . . will be available and tendered sometime in late November or the first week in December" and asked for verification that the Customer was willing to accept delivery. No such verification came. As we have stated, the Buyer did not build the machine. The assertion that it was being built was false.

As part of the APA, the Shareholders of the Seller leased real property to the Buyer. The Buyer did not make its rent payments and, in addition, damaged the property. On October 23, 2003, the Shareholders filed an action against the Buyer in Bradley County Circuit Court seeking to recover unpaid rent and property damage. That case was transferred to the trial court and consolidated with this case for trial. The Shareholders prevailed on their claim, and that judgment is not challenged on appeal.[2]

On September 30, 2003, Sonnentag, as the sole shareholder of both Modern Tennessee and Modern Florida, orchestrated a transfer of all of Modern Tennessee's assets to Modern Florida, leaving Modern Tennessee judgment-proof. His wife loaned Modern

[2]The Buyer and its co-defendants maintain that if this appeal results in a judgment in their favor and against the Seller and its Shareholders, the judgment for unpaid rent and property damage in their opponents' favor would be treated as an offset. We will leave that detail to the trial court or remand.

Florida $1,950,000. Modern Florida paid Modern Tennessee $1,950,000 for its assets. In turn, Modern Tennessee paid Sonnentag the $1,950,000 that it owed him on a loan he had made to Modern Tennessee to fund the purchase of the Seller's assets. Modern Florida expressly excluded any liability for the Cascade contract and for the lease obligations to the Shareholders.

The Customer filed its complaint in the trial court on February 27, 2004, naming the Seller and the Buyer as defendants. The Buyer filed its answer and then, just a few days later, unbeknownst to the Customer, filed articles of dissolution authorized by the Buyer on September 30, 2003, with the Tennessee Secretary of State. The Buyer continued to defend this action and file pleadings and discovery responses as if it were still in business.

Approximately two years into the litigation, the Customer learned of the dissolution of Modern Tennessee and the transfer of its assets to Modern Florida. The Customer then amended its complaint to add Sonnentag and Modern Florida as parties. The Customer included a claim that the actions of the added defendants were unfair and deceptive and violated the TCPA. The Seller amended its pleadings to conform to the Customer's new allegation. Four days after filing its answer, Modern Florida transferred all of its assets to another entity solely owned and controlled by Sonnentag leaving Modern Florida without assets. The Customer later dismissed without prejudice all aspects of its claim against the Seller except its claim for breach of contract.

In January 2008, before the February 2008 trial, the court granted partial summary judgment in favor of the Customer holding that the Cascade contract was a valid and enforceable contract. It also granted a motion in limine filed by the Customer excluding deposition testimony of Noirot that there was not a contract because of the parties' disagreement about what the Customer was to receive.

When the case came on for trial, the various claims other than the rent and property damage claims of the Shareholders were as follows:

> The Customer's claims against Modern Tennessee, Modern Florida and Sonnentag:
>
>> Repudiation of the Cascade contract
>> Breach of the Cascade contract
>> Tennessee Consumer Protection Act
>> Tennessee Uniform Fraudulent Transfer Act
>> Negligent and Fraudulent misrepresentation

The Customer's claims against the Seller and the Shareholders:

   Breach of contract

The Seller and Shareholders' claims against Modern Tennessee,
Modern Florida and Sonnentag:

   Breach of the APA
   Indemnification pursuant to APA
   Tennessee Consumer Protection Act
   Tennessee Uniform Fraudulent Transfer Act
   Common law fraud
   Promissory fraud

The Buyer's claims against the Seller and the Shareholders:

   Breach of the APA
   Indemnification pursuant to APA
   Negligent and Fraudulent Misrepresentation
   Tennessee Consumer Protection Act

With respect to the Customer's claims, the court held that both the Seller and the Buyer breached the contract because they did not build the corrugator. However, the court held that the Seller's liability was secondary, as the assignor, and that the Buyer's liability was primary. The court found that the Buyer repudiated the Cascade contract by failing to provide assurances that the machine would "produce[] the quality needed" after the Customer justifiably asked for assurances. Also, the trial court found that the Buyer violated the TCPA by false and deceptive trade practices comprised of (1) fraudulent misrepresentations that the machine would be delivered when in fact the Buyer did not intend to build the machine, (2) fraudulent misrepresentations exaggerating the Seller's culpability, and (3) fraudulent conveyances of all its assets in order to insulate itself from judgment.[3] Further, the court pierced the corporate veil of both Modern Tennessee and Modern Florida and held

---

[3]The court stated:

> [The Buyer] failed to prove its defense of impossibility of performance. Based on the actions of [the Buyer] in affirming the contract and then denying its ability to perform several times over several months and subsequently accusing [the Seller] of fraud and the shell game in moving assets, the court finds [the Buyer] intentionally misrepresented . . . its intentions regarding the contract and therefore violated the Tennessee Consumer Protection Act and is thus liable to [the Customer] for attorney's fees. [The Buyer] is guilty of unfair and deceptive acts.

Sonnentag personally liable for the actions of Modern Tennessee.[4]  The court awarded the Customer judgment against Modern Tennessee, Modern Florida, and Sonnentag in the amount of $657,129.51.  This amount represents the Customer's down payment of $113,290, trebled to $339,870; prejudgment interest of $54,526.68; and attorney fees of $262,732.83.  The court awarded the Customer judgment against the Seller, as a surety, in the amount of $167,816.68, made up of the down payment and prejudgment interest.

Based on the reasoning (1) that the Buyer breached the APA when it failed to perform the Cascade contract, (2) that the Buyer committed promissory fraud by misrepresenting its intention to perform the Cascade contract, and (3) then committed unfair and deceptive acts to try to avoid liability or insulate itself from liability, the court held Modern Tennessee, Modern Florida and Sonnentag liable to indemnify the Seller to the extent the Seller satisfies the Customer's judgment of $167,816.68 plus attorney's fees of $189,004.85.

---

[4]The court's reasoning was as follows:

> A combination of several of the applicable factors mandates piercing of the corporate veil and the holding of Sonnentag personally liable for [the Seller's] and [the Customer's] claims.  There is no dispute that Sonnentag is the sole shareholder of both Modern Tennessee and Modern Florida.  As the sole shareholder of both corporations, Sonnentag fraudulently and secretly diverted Modern Tennessee's assets to Modern Florida to the detriment of Modern Tennessee's creditors.
>
> Sonnentag consistently failed to maintain an arms-length relationship between Modern Tennessee and Modern Florida.  The assets of both were commingled.  For example, the money Sonnentag loaned to Modern Tennessee to buy [the Seller] was deposited into Modern Florida's bank account, and Modern Florida paid for [the Seller].
>
> Moreover, Sonnentag testified that, from his perspective, there is no difference between Modern Tennessee and Modern Florida.  As Sonnentag stated succinctly, "Modern is Modern."  Both companies had the same employees and attorneys.  It was an attempt to shield liability and responsibility.
>
> Sonnentag's commingling of the two entities' assets and liabilities as well as his complete disregard for corporate formalities mandates a piercing of the corporate veil and a finding that Sonnentag is personally liable for [the Seller's] indemnification claim.

The court held that the same actions constituted fraudulent transfers of the Buyer's assets and common law fraud toward both the Customer and the Seller.

-13-

The court held that even though the Seller negligently misrepresented the status of the Cascade contract by failing to disclose that the Customer had declared the project dead until further assurances were received, the misrepresentation was not material, and did not cause any damage to the Buyer.[5] The court based its finding of no damages upon the fact that the Buyer did not build the corrugator. Based upon the same reasoning, the court found that the Seller did not breach the APA.

The court entered a final judgment in accord with its findings in its memorandum opinion. The Buyer and its co-defendants, Modern Florida and Sonnentag, filed this timely appeal, challenging the adverse judgment and the trial court's failure to award judgment in favor of Buyer against the Seller and the Shareholders.

---

[5]The court stated with regard to the misrepresentation as follows:

> Although Nick Noirot informed Chris Turner on May 30, 2003, that the deal was "dead" and "on hold" until [the Seller] could produce acceptable samples from a corrugator with one drive, Chris Turner did not disclose it to [the Buyer] before the closing of the Asset Purchase Agreement.
>
> [The Seller] had a contractual and fiduciary duty to inform [the Buyer] of any development with the [Cascade] contract, particularly any developments occurring after the parties signed the Asset Purchase Agreement on May 28-29, 2003 and signing the closing documents on June 3, 2003.
>
> [The Buyer] asked [the Seller] for all documents and information relating to the Cascade project. [The Buyer] clearly evidenced a desire to discover all information about this contract as it completed its due diligence before closing on the Asset Purchase Agreement.
>
> The Court finds that [the Seller] did not intentionally mislead [the Buyer] about the status of the Cascade contract. The Court does find that [the Seller] negligently misrepresented the status of the Cascade contract; however, the omission was not material. The cost to correct the defect was insignificant in light of the totality of the circumstances. The complete contract price was over $200,000. But for [the Buyer] deciding the project was underbid, it could have completed the contract. [The Buyer] could have but never did exercise the option to rescind the Asset Purchase Agreement; therefore, [the Buyer] is responsible for and accepted the contract and all damages caused by the breach of the contract. It is therefore liable for damages caused by the breach. [The Seller] was no longer responsible for the Cascade project as between [the Seller] and [the Buyer] but was responsible to [the Customer].

-14-

III.

Specifically, the Buyer, Modern Florida and Sonnentag raise the following issues which we have shortened and restated to conform to the arguments advanced in their brief.

> Whether the trial court erred in finding that the misrepresentation concerning the status of the Cascade contract was not material.
>
> Whether the trial court erred in finding that the Seller and the Shareholders were not liable to the Buyer for its attorney's fees under the escrow agreement and indemnification provision of the APA because of the Seller's failure to disclose the Customer's declaration that the Cascade contract was dead until further assurances were made.
>
> Whether the evidence preponderates against the finding that the Buyer committed promissory fraud.
>
> Whether the trial court erred in holding the Buyer and its co-defendants liable under the TCPA based on actions that happened after the Customer executed the Cascade contract and declared the project dead and the contract in breach.
>
> Whether the trial court erred in piercing the corporate veil of Modern Tennessee and Modern Florida and holding Sonnentag personally liable for the actions of the entities.

The Seller purports to raise an issue as to the trial court's finding of a "fiduciary duty" to the Buyer to disclose "any development" with regard to the Cascade contract. However, the Seller concedes that it had a duty to disclose material developments. Based on our conclusion that the Seller's failure to disclose that the Customer had declared the project dead until a demonstration of quality could be made was a material misrepresentation, we will not reach this inconsequential issue.

IV.

The interpretation of a written contract is a matter of law and not of fact. *Wills & Wills, L.P. v. Gill*, 54 S.W.3d 283, 285 (Tenn. Ct. App. 2001). Therefore, our review of the

-15-

terms of a contract and the obligations it imposes on the parties is *de novo* with no presumption of correctness. ***Id***.

V.

The core of the Buyer's argument is that the trial court erred in reading into the Cascade contract an obligation in conflict with the explicit terms of the PA and one that was not even disclosed by the Seller to the Buyer as a point of contention with the Customer. The obligation the Buyer speaks of is the obligation to build a corrugator that will "produce[] the quality needed" by the Customer. The Buyer argues that the error permeated all aspects of the memorandum opinion which formed the basis for the judgment. The Buyer points out, correctly, that even though the court granted partial summary judgment holding that a valid and enforceable contracts exists, it did not identify the key provisions of the contract in either its order granting partial summary judgment or its memorandum opinion.

The Customer argues that the trial court got everything right, even going so far as to argue in support of the recovery by the Seller. The Customer stresses the bad actions of the Buyer and its co-defendants to the point of arguing that this case is not at all about the contracts, but a case about the bad acts of the Buyer and its cohorts. The Seller argues that the trial court erred in finding that it had a fiduciary duty to inform the Buyer of "any development" with the Cascade contract, but otherwise was correct in all respects. The Seller also focuses on the bad acts of the Buyer and its co-defendants.

We agree with the Buyer on several significant points, the first of which is that, even if all the factual findings of the trial court are accepted as true, the terms of the PA did not obligate the Buyer to build either a dual-drive corrugator or a corrugator that would "produce[] the quality needed" by the Customer. It is also clear that the corrugator the Customer expected, and upon which it demanded assurances, was something other than what it was entitled to receive under the Cascade contract. The deal was to build a horizontal corrugator per the Seller's quote "subject to the terms and conditions set forth in" the PA.

One of those "terms and conditions" explicitly speaks to when the obligation to build the corrugator arises: "[The Customer] shall approve [the Seller] prepared project definition form . . . prior to [the Seller] manufacturing [the corrugator]." The trial court found that the Buyer and the Seller breached the Cascade contract by not building a corrugator. It is undisputed that the Customer refused to approve the project definition upon learning that it described a corrugator with one drive rather than two. *Therefore, the obligation to build the corrugator never ripened.*

-16-

The evidence strongly preponderates in favor of a finding that the primary concern of the Customer was not the number of drives employed but, rather, that the machine it would pay for and receive under the PA would produce a product of acceptable quality. In essence this is what the trial court found:

> Noirot was personally unfamiliar with the number of drives on corrugators and could not tell by looking at a corrugator how many drives it had. . . . [The Customer] would have bought the corrugator even if it had needed an additional drive as long as it produced the quality needed which [the Seller] said could be accomplished.

The problem with finding a breach by either the Seller or the Buyer based on the failure to build a machine that would produce a certain quality end product is that the PA explicitly negates such an obligation.

> [The Customer] acknowledges that [the Seller] has not made and does not make any warranty or representations, either expressed or implied, or any kind whatsoever with respect to the ultimate product which may be obtained from the [corrugator].

The PA also excludes, in all capital letters, any "WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE."

We have very little doubt that the Customer thought it was buying a machine that would produce acceptable quality porch columns. Once the Seller and the Customer joined forces against the Buyer, the Seller essentially stipulated that its deal with the Customer was to produce such a machine. However, the Seller's stipulation after the fact does not bind the Buyer to terms contrary to those in the contract, especially since the Buyer was not told of the Customer's expectations until after the closing. The question becomes whether the explicit terms of the contract were modified. The trial court did not make a specific finding as to whether the terms of the written contract were modified by oral discussions or the course of conduct or dealing between the Customer and the Seller. Regardless, the PA expressly speaks to any such possibility:

> This Agreement represents the entire agreement of the parties and supersedes all previous discussions, representations, negotiations and writings. No Amendment to this Agreement is valid unless it is in a written instrument that is signed by authorized representatives to this Agreement. A course of

conduct shall not be deemed an amendment to this Agreement.

We must hold, therefore, that while the Seller was free to make any concession to the Customer it chose while it was the entity responsible for making the corrugator, it was not legally bound, nor could it bind the Buyer, to manufacture a corrugator that would produce columns of a certain quality.

The Seller attempts to distinguish between a warranty or a representation that the machine would produce columns of a certain quality on one hand, and a demand for assurance that the machine would produce acceptable quality samples. The Seller argues "all . . . [the Buyer] had to do was produce samples on a single-drive corrugator that were as good as those previously approved by Cascade." We believe this is a distinction without a difference in the context of this case. The Buyer ran samples on a single drive machine that the Customer did not find acceptable. The Customer then took the position that any risk that the machine would not produce an acceptable end product was on the Buyer; Noirot testified, "I told [Karr] . . . if you build a machine and . . . it doesn't work, it doesn't hit our specs, then I'm not going to pay the last [payment of] 30%."

Since we have acknowledged that the Customer obviously had expectations of receiving a machine that would produce a certain quality product, we think it prudent to address any perceived unfairness in our holding. First, we note that the Customer was not a typical household consumer. It was an established business entity with a certain amount of sophistication. Its agents read the project definition carefully enough to detect that the corrugator being described employed only one drive unit. If it had read the PA as carefully, it would have seen the exclusionary provisions. The law presumes that the Customer did read and understand the PA. *See Giles v. Allstate Ins. Co., Inc.*, 871 S.W.2d 154, 157 (Tenn. Ct. App. 1993).

Second, and more importantly, the Customer was protected from "disaster" by an escape clause which gave it the ability to cancel the contract, in which event "[w]ork on the balance of the order will be stopped as promptly as reasonably possible" with the obligation only to reimburse the builder of the machine for its costs "plus a reasonable profit on such items." The Seller and the Buyer both acknowledge that since the Customer declared the project "dead," or repudiated as the case may be, before any materials were purchased or any work was done, the Customer is entitled to recover its down payment in its entirety.

The next key question in this case is from whom may the Customer recover its down payment. The answer is both the Seller and the Buyer. Neither the Seller nor the Buyer argue on appeal that there was not a contract with the Customer. The Buyer in fact argues that there was a written contract that protected it from the obligation of building a machine

that matched the customer's expectations. The contract of which it took an assignment protected it from the Customer's unjustified expectations under our holding above. The only real argument that the Buyer makes against being held liable to the Customer for the down payment is that the Seller is the party that received the down payment. That is no answer. The same contract that protected the Buyer from the Customer's expectations obligated the Buyer, as the assignee of the Seller's covenants, to reimburse the down payment. The Seller remains liable to the Customer despite the delegation of its performance to the Buyer. *See* Tenn. Code Ann. § 47-2-210 (1) (2001) ("No delegation of performance relieves the party delegating of any duty to perform or any liability for breach."). There has been no challenge to the award of prejudgment interest tacked onto the amount of the down payment, therefore we will not disturb that part of the trial court's judgment.

It will be helpful in understanding the remainder of our analysis for us to clarify and summarize our holdings to this point. We hold that the trial court erred in finding that the Buyer and the Seller breached the Cascade contract by not building a corrugator. That obligation did not arise because the Customer did not approve the project definition. The Buyer did not repudiate. Rather, the Customer cancelled the contract as it was allowed to do. At that point, the Buyer and the Seller became obligated to refund the Customer's down payment.

The next logical question is whether the Buyer should have been allowed indemnification under the APA and the escrow agreement. This implicates the issue of whether the Seller's misrepresentation was material. The misrepresentation of which we speak is the failure to disclose that the Customer had declared the project "dead" until further assurances were forthcoming. The trial court classified its finding of non-materiality as a conclusion of law. Under the facts of this case, we agree with the trial court's "classification" of this issue. Accordingly, we will review it *de novo* without a presumption of correctness. ***Gill***, 54 S.W.3d at 285; ***Abdur'Rahman v. Bredesen***, 181 S.W.3d 292, 305 (Tenn. 2005)(standard of review of mixed questions of law and fact is *de novo* without presumption of correctness).

A concise way of stating the test of materiality is that "[a] misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." ***Thoroughbred Motorcars, Inc. v. Draper***, No. 01A01-9219-CV-000468, 1993 WL 135436, at \*2 (Tenn. Ct. App. W.S., filed April 30, 1993); *see also*, ***Patel v. Bayliff***, 121 S.W.3d 347, 353 (Tenn. Ct. App. 2003). The primary reason given by the trial court for finding the misrepresentation not to be material is that the Buyer did not exercise its right to terminate and declare the APA null and void by June 15, 2003, the time window given in the APA. The Seller argues in support of the trial court's finding that the breach, or misrepresentation, must be viewed "in

the context of [the Seller's] total obligations." ***Adams TV of Memphis v. Comcorp of Tenn.***, 969 S.W.2d 917, 921 (Tenn. Ct. App. 1997). Since the Buyer did not rescind the whole deal, the argument goes, the omission could not have been material in the context of the APA's totality. We are not persuaded. A buyer that is damaged by a breach of contract involving a misrepresentation can elect, as late as after the verdict comes in, between rescission of the contract and recovery of the purchase price, or damages. ***Goodman v. Jones***, No. E2006-02678-COA-R3-CV, 2009 WL 103504 at *9-10 (Tenn. Ct. App. E.S., filed Jan 12, 2009). The Seller's argument, and the trial court's finding, amount to an incorrect election of remedies requirement.

The Buyer points out that terminating the APA after the closing would have been like trying to un-ring a bell. The substance of the Buyer's argument is that it is not fair to test materiality by whether it was willing to scrap the whole deal because of this one problem. One of the trial court's factual findings that indirectly supports the Buyer's position is that there were other things of value that the Buyer acquired that it did not want to lose.

We agree with the Buyer that the misrepresentation was material. It seems apparent to us that any reasonable party in the Buyer's position would want to know before assuming a limited number of obligations that a dispute had arisen concerning one of those obligations. The record in this case fully supports that conclusion. The trial court specifically found that the Buyer "clearly evidenced a desire to discover all information about this contract as it completed its due diligence before closing on [the APA]." The fact that the Seller specifically covenants under the APA not to misrepresent its obligations and that the parties included the indemnification clauses and the escrow agreement to provide relief for misrepresentations supports an interpretation that provides relief for an impairment of the bargain short of something that ruins every aspect of it. We hold, therefore, that the trial court erred in its conclusion that the Seller's failure to disclose problems with the Cascade contract was not material.

Before moving forward to another point, we will deal briefly with the trial court's reasoning that the Seller's omission was not material because all of the problems could have been cured by someone spending a mere $5,000 for a second drive. The Buyer takes issue with the amount, but we hold that the evidence does not preponderate against the finding that the cost of a second drive would have been approximately $5,000. Rather, we hold that the finding was in error because it was a vast oversimplification of a complicated dispute. By the time the Buyer closed, the Customer was not demanding a second drive, but a demonstration that the machine to be built would produce samples of the same quality produced in the earlier demonstration. The Customer's demand included square columns even though the initial demonstration dealt only with round columns. The Customer never approved a project definition. By the time the matter came to a head, the Customer's position

-20-

was that the Buyer was building the machine subject to the risk the Customer would not pay if the corrugator did not "meet . . . specs." Any reasonable entity in the Buyer's position would have wanted to know that the Customer had declared the project on hold, so as to be able to decide what to do about scenarios such as actually came to pass. We stand by our holding that the Seller's omission was material.

The trial court also held that the Seller could not be liable to the Buyer because the Buyer was not damaged. This finding will not withstand scrutiny under our holdings thus far. At the very least, rather than performing the contract that it assumed with at least some prospect of making a profit or minimizing its loss, the Buyer is now being held liable to refund the down payment. Moreover, the Buyer unknowingly purchased a lawsuit. It is now in a worse position than it would have been had the contract been performed. *See **GSB Contractors, Inc. v. Hess***, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005)(the proper measure of damages for breach of contract is to place the non-breaching party in the position it would have been in had there not been a breach).

Our holdings (1) that the contract the Buyer assumed did not include the obligation to supply a dual-drive corrugator or a corrugator that would make products of a warranted quality and (2) that the Buyer was damaged by a material misrepresentation of the Seller require that we hold the trial court erred in awarding the Seller indemnification and denying the Buyer indemnification. As the Buyer has pointed out, the trial court's error in enforcing a term that the PA did not include permeated the court's memorandum opinion and resulting judgment. The APA excludes from the Buyer's responsibility any "liability or obligation . . . which arises out of or is based upon any express or implied representation, warranty, agreement or guarantee made by [the] Seller, or alleged to have been made by [the] Seller, or which is imposed or asserted to be imposed by operation of law, in connection with any . . . product sold . . . by . . . [the] Seller on or prior to the Closing Date." The Buyer assumes only the obligations specifically listed and excludes "any other liability or obligation." The Seller and its Shareholders are required to indemnify the Buyer against any loss that results from (1) "any and all liabilities and obligations of [the Seller] . . . of any nature whatsoever . . . except those liabilities and obligations which [the Buyer] specifically assumes," and (2) "any misrepresentation, breach of warranty or nonfulfillment of any agreement or covenant . . . under this Agreement." Also, the escrow fund was created for the recognized purpose of providing security to the Buyer against any losses, damages or expenses, including litigation expenses, "arising out of or resulting from: (a) the breach of any warranty or representation of [the] Seller . . . or (b) any excluded liabilities . . ." We hold that provisions of the APA and the attached escrow agreement required that the Seller and the Shareholders indemnify the Buyer, and not vice-versa, for any losses and expenses, including reasonable attorney fees, incurred in defending against the claim that the Buyer was obligated to build a machine that either had dual-drives or would produce an end product of the Customer's

expected quality. We hold that the Buyer's right to indemnification most certainly includes the right to be indemnified against the amount of the down payment and prejudgment interest. We will leave it to the trial court on remand to determine the exact amount of the other elements of indemnification, including reasonable attorney's fees related to the "down payment" aspect of the case versus other aspects.

In view of our previous holdings, it may be that we could skip directly to our conclusion without directly addressing the promissory fraud, the TCPA claims, and the piercing of the corporate veil. We will, nevertheless, work our way through these points with brevity and clarity in mind, rather than exhaustive analysis.

The finding of promissory fraud against the Buyer is premised upon the idea that it never had the intention of building the machine. We disagree. Even if all the trial court's factual findings are correct, its legal conclusion was wrong. The thrust of the Buyer's communications were that it could build the machine that the Seller sold under the express terms of the PA but the Customer would most likely be dissatisfied because it demanded more. There was nothing wrong or inaccurate about those communications. This litigation has proven that the Buyer was correct. Moreover, we have held that in light of the Customer's refusal to approve the project definition, the obligation to build the corrugator was not triggered.

We also hold that the trial court erred in finding the Buyer liable for violations of the TCPA. Given our analysis to this point, the only thing other than defending itself in this litigation that the Buyer did that arguably caused harm to the Customer was in failing to promptly refund the down payment. There is plenty of documentary evidence in the record that the Buyer did actually try to facilitate repayment of the down payment through the Seller and the escrow fund. Since that is the same end result we have reached, we cannot reconcile holding the Buyer liable under the TCPA with our holding that the Seller is ultimately liable for the down payment out of the escrow fund. At most, the Buyer's refusal to refund the down payment out of its pocket was a failure to perform its obligation of refund under the contract. Not every failure to perform a contract is a violation of the TCPA. *Hall v. Hamblen*, No. M2002-00562-COA-R3-CV, 2004 WL 1838180, at *4 (Tenn. Ct. App. M.S., filed Aug. 16, 2004). Even if the Buyer did misrepresent its true intentions with regard to building the machine, those misrepresentations did not cause a loss to either the Seller or the Customer. Under the TCPA, the "loss of money or property" must be "a result of . . . [the] unfair or deceptive act." Tenn. Code Ann. § 47-18-109(a)(1)(2001); *White v. Early*, 211 S.W.3d 723, 742 (Tenn. Ct. App. 2006). The Customer paid the money long before the Buyer's representations, and both the Customer and the Seller held to their respective positions after receiving those representations. In other words, the Buyer's alleged misrepresentation did not cause either the Seller or the Customer to do something that had

-22-

not already been done. We find it interesting, also, that the Customer now so adamantly argues it was harmed by the Buyer's broken promise to build the corrugator, but prior to the litigation was adamantly, through Noirot, warning the Buyer that if it built a corrugator that did not satisfy Noirot, the Customer would not pay.

The final issue we must address is the Buyer's attempt to hide away its assets with the help of Modern Tennessee and Sonnentag. We do not in any way condone these actions. However, the end result is that these actions did not result in any harm to either the Customer or Seller. The Customer will recover its down payment with interest. These funds are available from the escrow fund and ultimately will come out of the Seller's pocket. The Buyer, by placing a portion of the purchase price in escrow, made available liquid funds to satisfy the judgment. The trial court therefore erred in placing personal liability on Sonnentag to satisfy obligations that either did not exist or were satisfiable through funds made available by the Buyer, Modern Tennessee. We will not discuss and do not decide whether, had the trial court been correct in entering a $600,000 plus judgment against Modern Tennessee, the court's analysis would have been correct. We do not render advisory opinions. ***McIntyre v. Traughber***, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994).

## VI.

To summarize, we take these actions with regard to the trial court's judgment: (1) we reverse the judgment against Modern Florida and John Sonnentag; (2) we modify the judgment in favor of the Customer and against Modern Tennessee so as to provide that Modern Tennessee is not liable for breach of contract, promissory fraud or treble damages and attorney's fees under the TCPA, but is liable to the Customer for refund of the down payment in the amount of $113,290 plus prejudgment interest of $54,526.68 for a total of $167,816.68; (3) we modify the judgment in favor of the Customer and against the Seller to provide that Seller is not liable for breach of contract but that Seller is responsible for refund of the down payment plus prejudgment interest for a total of $167,816.68; (4) we reverse the judgment awarding the Seller indemnification and attorney's fees against the Buyer and award Buyer indemnification against the Seller and the Shareholders to include any amount Buyer pays the Customer and such further amount as determined by the trial court on remand; and (5) we affirm the judgment except as modified or reversed herein.

## VII.

The judgment of the trial court is reversed in part and modified in part. Those portions of the trial court's judgment not reversed by this opinion are affirmed as modified. Costs on appeal are taxed to appellants Cullom Machine Tool and Die, Inc., nka CMTD, Inc.,

Heinrich B Dickhut and Karen J. Dickhut.  This case is remanded, pursuant to applicable law, for further proceedings consistent with this opinion.

_____
CHARLES D. SUSANO, JR., JUDGE